UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SAWSAAN TABBAAA, HASSAN SHIBLY,          :
ASMAA ELSHINAWY, KAREMA ATASSI,          :
and GALEB RIZEK,                          :
                                          :
                Plaintiffs,               :
                                          :
        -versus-                          :
                                          :        1:05-CV-582 (S)
MICHAEL CHERTOFF, Secretary of the United :
States Department of Homeland Security;   :
ROBERT C. BONNER, Commissioner of the     :
United States Customs and Border Protection; :
MICHAEL D'AMBROSIO, Director of Field     :
Operations in Buffalo, United States Customs :
and Border Protection; and JOSEPH J. WILSON, :
Buffalo Port Director for the United States :
Customs and Border Protection,            :
                                          :
                Defendants.               :
-------------------------------------------------------------x


# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
# FOR PRELIMINARY INJUNCTION


Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
    FOUNDATION, by

CHRISTOPHER DUNN
COREY STOUGHTON
UDI OFER
ARTHUR EISENBERG
125 Broad Street, 17th Floor
New York, N.Y. 10004
(212) 344-3005

CATHERINE KIM
American Civil Liberties Union Foundation
125 Broad Street, 17th Floor
New York, N.Y.  10004
(212) 549-2500

ARSALAN IFTIKHAR
KHURRUM WAHID
Council on American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C.  20003
(202) 488-8787

MICHAEL WISHNIE
245 Sullivan Street, 5th Floor
New York, N.Y.  10012
(212) 988-6430
NYCLU Cooperating Attorney

DAVID JAY
69 Delaware Avenue
Suite 1103
Buffalo, N.Y. 14202
(716) 856-6300

Dated: November 28, 2005
    New York, N.Y.

On the brief:   Daniel Freeman, Law student intern
        Murad Hussain, Law student intern
        Rizwan Sabar, Law student intern
        Allard K. Lowenstein International Human Rights Clinic,
            National Litigation Project, Yale Law School

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.     PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON
         THEIR CLAIM THAT DEFENDANTS' POLICY OR PRACTICE
         VIOLATES THEIR FIRST AMENDMENT RIGHT TO FREEDOM
         OF SPEECH AND ASSOCIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.    PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON
         THEIR CLAIM THAT THE GOVERNMENT'S POLICY OR
         PRACTICE VIOLATES THE FIRST AMENDMENT'S FREE
         EXERCISE CLAUSE AND THE RELIGIOUS FREEDOM
         RESTORATION ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    III.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON
         THEIR CLAIM THAT THE GOVERNMENT'S POLICY OR PRACTICE
         VIOLATES THE FOURTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    IV.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR
         CLAIM THAT DEFENDANTS' POLICY OR PRACTICE  VIOLATES THE
         ADMINISTRATIVE PROCEDURES ACT . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

<u>CASES</u>

<u>Aptheker v. Secretary of State</u>, 378 U.S. 500 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 18

<u>Boerne v. City of Flores</u>, 521 U.S. 507 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Church of Scientology of Calif. v. Simon</u>,
    460 F. Supp. 56 (C.D. Cal. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Church of the Lukumi Babalu Aye v. City of Hialeah</u>,
    508 U.S. 520 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Covino v. Patrissi</u>, 967 F.2d 73 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>DeJonge v. Oregon</u>, 299 U.S. 353 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 17

<u>Eng v. Smith</u>, 849 F.2d 80 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Fifth Ave. Presbyterian Church v. City of New York</u>,
    293 F.3d 570 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Ford v. McGinnis</u>, 352 F.3d 582 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal</u>,
    No. 04-1084, 2005 WL 1650792, 125 S. Ct.1084 (2005) . . . . . . . . . . . . . . . . . . . . . . 18

<u>Hayes v. Florida</u>, 470 U.S. 811 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Heidy v. U.S. Customs Service</u>,
    681 F. Supp. 1445 (C.D. Cal 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Jolly v. Coughlin</u>, 76 F.3d 468 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18, 19, 20

<u>Kent v. Dulles</u>, 357 U.S. 116 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Lamont v. Postmaster General of the United States</u>,
    381 U.S. 301 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Latino Officers Association v. City of New York</u>,
    196 F.3d 458 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>McEachin v. McGuinnis</u>, 357 F.3d 197 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

NAACP v. Claiborne Hardware Co.,
    458 U.S. 886 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18

NAACP v. State of Alabama ex rel. Patterson,
    357 U.S. 449 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Roberts v. United States Jaycees,
    468 U.S. 609 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Sherbert v. Verner, 374 U.S. 398 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Terry v. Ohio. 392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. 1903 Obscene Magazines,
    907 F.2d 1338 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Arvizu, 534 U.S. 266 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Asbury, 586 F.2d 973 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . 21, 23

United States v. Charleus, 871 F.2d 265 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 21

United States v. Diamond, 471 F.2d 771 (9th Cir. 1973) . . . . . . . . . . . . . . . . . . . . 24

United States v. Diezel, 608 F.2d 204 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Montoya de Hernandez, 473 U.S. 531 (1985) . . . . . . . . . . . . . . . 20, 23

United States v. Nunes, 511 F.2d 871 (1st Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . 24 , 25

United States v. Ramon, 86 F. Supp.2d 655 (W.D. Tex. 2000) . . . . . . . . . . . . . . . . 16, 19

United States v. Robel, 389 U.S. 258 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 18

United States v. Sanders, 663 F.2d 1 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . 21, 23

United States v. Sigmond-Ballesteros,
    285 F.3d 1117 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Tehrani, 49 F.3d 54 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Ventura, 947 F. Supp. 25 (D.P.R. 1996) . . . . . . . . . . . . . . . . . . . . 21

Ybarra v. Illinois, 444 U.S. 85 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

STATUTES AND RULES

19 U.S.C. §1455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

19 U.S.C. §1461 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

19 U.S.C. §1499(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

19 U.S.C. §1582 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

19 U.S.C. §1559 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Administrative Procedure Act,
    5 U.S.C. §551 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Administrative Procedure Act,
    5 U.S.C. §706(2)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Religious Freedom Restoration Act,
    42 U.S.C. § 2000bb et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

This case challenges a government policy or practice under which thousands of law-abiding American citizens about whom the government has no suspicion of any wrongdoing are subject to being detained, interrogated, fingerprinted, and photographed merely for attending a religious conference.  Under this policy or practice, the United States Department of Homeland Security ("DHS") issued a directive to border officials in New York, Los Angeles, Seattle, North Dakota, Detroit, and the Caribbean to stop and divert for special investigation every person border officials could identify as returning from any of several Islamic conferences taking place during December 2004.  The sole basis for this directive was the receipt of intelligence indicating that a person or persons the government believed to be associated with terrorist activity might attend any of several Islamic conference scheduled to take place that month.

Pursuant to that directive, all five Plaintiffs in this action were stopped at a Buffalo-area border crossing solely because they had attended the Reviving the Islamic Sprit ("RIS") Conference, a mainstream Islamic conference held in the Toronto Skydome on December 25 and December 26, 2004.  That conference was attended by over 13,000 people, featured as speakers several prominent mainstream imams and Muslims scholars, and involved Muslims associating with each other in a wide range of lawful activities, including prayer and religious services.

Upon their return from the conference, all five Plaintiffs – and dozens of other American citizens who are Muslim – were detained by border authorities, interrogated about their activities at the conference, fingerprinted, and photographed, in a process that took as long as six hours.  In subjecting them to this treatment, government officials had no reason to believe any of the plaintiffs had engaged in any wrongdoing.  Indeed, the government's intelligence did not even

1

indicate that the persons about whom it was concerned would be attending the RIS Conference.

The 2005 RIS Conference is scheduled to take place this year starting on December 23. At least three of the five Plaintiffs plan to attend that conference but understandably do not wish to be subjected to the same mistreatment they experienced last year. The Plaintiffs therefore seek a narrow preliminary injunction barring the government from enforcing its policy or practice against the Plaintiffs at the upcoming conference.

## STATEMENT OF FACTS

The facts underlying this controversy appear to be undisputed. As spelled out in deposition testimony by government officials and in affidavits submitted by the plaintiffs, the relevant facts are as set out below.

The Government's Policy and Practice

On December 16, 2004, the National Targeting Security Office ("NTSO") of Customs and Border Protection (CBP) – the agency within DHS responsible for border activity – circulated "intelligence related to certain Islamic conferences." *See* Defendants' Privilege Log, Entries 81, 83 (attached to Stoughton Decl. as Ex. 1); Deposition of Robert Jacksta (Nov. 9, 2005) 163:19-164:5; 224:18-225:3; 230:8-231:21 (testifying that the author and known recipients of Privilege Log Documents 81 and 83 work in the NTSO) (attached to Stoughton Decl. as Ex. 2). Although Defendants have not produced this intelligence information, Defendants' witness Robert Jacksta, a high-level official within CBP, provided a general outline of what this information does – and does not – prove during his recent deposition.

As described by Mr. Jacksta, the intelligence "indicated that the conference or

conferences being held at that time of year were conferences that the possibility that [sic] there would be individuals or groups of individuals that might be attending that conference or those conferences that might be related to terrorist-related activities." Jacksta Deposition 151:22-152:10.  Several conferences, all taking place in December of 2004, were identified in this intelligence, and the intelligence did not draw any distinctions among those several conferences. *Id.* 152:11-158:8; *see also* Decl. of Michael D'Ambrosio (July 29, 2005) (attached to Stoughton Decl. as Ex. 3) (describing the intelligence as consisting of "specific concerns about a number of upcoming national and international conferences").  Each and every conference implicated by this intelligence was an Islamic religious conference. Jacksta Deposition 174:8-12.  Mr. Jacksta could say nothing more than that the intelligence indicated persons potentially associated with terrorism may attend any one of these conferences. *Id.* 221:9-224:15.

Pursuant to standard CBP policy and practice, this intelligence led to the issuance of a directive known as an Intelligence Directed Special Operation ("IDSO").  Like all IDSOs, this one was issued from a meeting of executives at the highest levels of CBP, including representatives from the Commissioner's Office. *Id.* 131:20-137:5.[1]

On December 22, 2005, CBP's national headquarters transmitted the IDSO to field offices across the country, including locations in the Caribbean, Los Angeles, Seattle, North Dakota, Detroit, Newark and JFK airports, and Buffalo. *See* Privilege Log Entries 11, 85; Jacksta Deposition 162:13-165:12 (identifying the recipients of IDSO as Port Directors for the

---

[1]Plaintiffs have been unable to obtain any specific discovery regarding the creation and issuance of the IDSO that triggered Plaintiffs' detentions.  The sole witness Defendants produced to testify on this subject had no personal knowledge of how and when it was created, *see* Jacksta Deposition 149:21-150:21, and Defendants have refused to produce the IDSO itself.

3

locations listed in the text above); 262:14-263:8 (testifying that if those Port Directors received

the IDSO, they would be expected to implement it in their ports).  The IDSO warned these

diverse field offices about the impending Islamic conferences and instructed them to subject all

individuals who might have attended any of these conferences to a special terrorism-related

investigation.  Jacksta Deposition 165:14-167:1.  Attendance at one of these conferences was the

sole factor that triggered this referral for special investigation.  *Id.* 182:3-13.[2]

Pursuant to this enforcement operation, CBP executed a directive known as a "muster"

ordering Buffalo border officers to subject all attendees of these Islamic religious conferences,

including the RIS Conference, to a more detailed examination and investigation.  *See* Muster -

IDSO 2005-06 (Bates No. DHS/CBP 348) (attached to Stoughton Decl. as Ex. 4); Jacksta

Deposition 191:12-193:5 (testifying that the IDSO instructed field offices to prepare a muster

sheet and inform local border officers how to implement the IDSO).  The local supervising

officer on duty the night four of the five Plaintiffs were detained, Dawn Caltagirone, testified that

she received instructions to refer people from the RIS Conference to secondary inspection,

interrogate them about possible links to terrorists, and conduct full inspections, which she

understood to mean fingerprinting and photographing.  *See* Deposition of Dawn Caltagirone

(Oct. 20, 2005) at 106:14-107:22; 221:14-223:10; 227:21-230:4 (attached to Stoughton Decl. as

---

[2]The IDSO instructed the field offices about certain protocols they were expected to follow with regard to conference attendees.  *Id.* 168:18-169:13.  These protocols were uniform across all field offices, and did not single out Buffalo or any other particular port for special consideration or special focus.  *Id.* 169:14-170:21.  The protocol included an order that border officers "ask a question on whether [persons presenting themselves at the border] actually attended the conference, and then based on that response, make a decision.  Obviously if it's yes, then the decision would be that further inspection would be required."  *Id.* 193:6-194:11.  The IDSO also required border officers to collect and maintain information on every traveler from these many Islamic conferences.  *Id.* 138:9-140:5.

Ex. 5); *see also* D'Ambrosio Decl. at ¶ 11 (stating that CBP followed "standard operating procedure" to question, fingerprint, photograph and collect data on Plaintiffs). As part of this process, an agent from Immigration and Customs Enforcement ("ICE") was present to conduct special interrogations. Caltagirone Deposition 150:8-154:2. Each time a person from the conference was inspected, agents from the National Targeting Center and the FBI's Joint Terrorism Task Force were notified. *See* Muster – IDSO 2005-06. The Buffalo port collected information about all conference attendees according to the reporting protocol set by the IDSO. *Id.*[3]

CBP did not have any information about Plaintiffs, other than their mere attendance at the RIS Conference, that prompted their examination under the IDSO. Jacksta Deposition 182:20-183:6; Caltagirone Deposition 163:4-16; 268:9-20. Nonetheless, Plaintiffs were processed pursuant to an Anti-Terrorism Passenger Validation Program ("APV"). *See* Talking Points Document (Bates No. DHS/CBP 296) (attached to Stoughton Decl. as Ex. 9) (stating that RIS Conference attendees were processed "under APV"); OFO Morning Summary Follow Up (Bates No. DHS/CBP 299) (attached to Stoughton Decl. as Ex. 10) ("All subjects were processed as APVs."). This APV program governs special inspections of any person with "some kind of connectivity to a terrorist activity" or who is "a possible terrorist." Jacksta Deposition 142:15-143:4; *see also id.* 148:6-8 (testifying that an APV referral is synonymous with "a terrorist

---

[3]This information is presently stored in Defendants' computer system. *See* TECS II Incident Logs (Bates No. DHS/CBP 263-295) (attached to Stoughton Decl. as Ex. 6); IOIL Narrative Reports (Bates No. 226-31) (attached to Stoughton Decl. as Ex. 7). Defendants' witnesses testified that this information is available to CBP officers and may be available to other law enforcement officials as well. *See* Deposition of David Fickett (Nov. 8, 2005) 113:3-115:9 (attached to Stoughton Decl. as Ex. 8).

referral."). APV inspections trigger a special protocol that is different from, and presumably

more intrusive than, the routine secondary inspection ordinary citizens encounter at the border.

*Id.* 147:7-148:8.[4]

Mr. Jacksta also testified that the 2004 IDSO and its directive that all conference

attendees be referred for special investigation, including fingerprinting and photographing, was

consistent with CBP policy, and nothing about that policy had changed since December 2004.

*Id.* 207:18-211:6; 245:9-21. Consistent with this, he testified that CBP would take similar

actions with respect to future Islamic conferences in response to similar intelligence.

Specifically, he explained that CBP again would provide the kind of intelligence-based directive

to field offices that they provided in 2004, which would result in conference attendees being

subjected, at a minimum, to special interrogation. *Id.* 200:12-207:17.

<u>The Treatment of the Plaintiffs</u>

Plaintiffs in this action are five United States citizens who attended the December 2004

RIS Conference in Toronto, Canada. Decl. of Karema Atassi ¶¶ 2-3; Decl. of Asmaa Elshinawy

¶¶ 2-3; Decl. of Galeb Rizek at ¶¶ 2-3; Decl. of Hassan Shibly ¶¶ 2-3; Decl. of Sawsan Tabbaa

¶¶ 2-3. The RIS Conference is a mainstream annual gathering organized by Canadian youth to

educate Muslims about their religion with a strong emphasis on the Islamic traditions of

tolerance and introspection.[5] RIS Website Materials (attached to Ofer Decl. as Ex. 1). The

---

[4]Defendants have refused to produce the document that lays out this special protocol, even in redacted form, despite it being the protocol governing the inspections of Plaintiffs. *See* Privilege Log, Entry 34, "Responding to Potential Terrorists Seeking Entry Into the United States." This document is one of several Plaintiffs seek in their pending Motion to Compel.

[5]Other Islamic conferences that convened in December 2004 that may have been subject
(continued...)

annual conference draws thousands of participants each year, and the December 2004 RIS

Conference attracted more than 13,000 individuals.  RIS Website Materials (attached to Ofer

Decl. as Ex. 2)

Plaintiffs attended the December 2004 RIS Conference to learn more about their faith,

participate in religious and cultural activities and to meet other Muslims.  Atassi Decl. ¶¶ 3-7;

Elshinawy Decl. ¶¶ 3-7; Rizek Decl. ¶¶ 3-5; Shibly Decl. ¶¶ 3-7; Tabbaa Decl. ¶¶ 3-6.  Several of

the Plaintiffs consider their participation in the RIS Conference to be a local version of their

religious obligation to perform the "Hajj" (pilgrimage).  Atassi Decl. ¶ 6; Tabbaa Decl. ¶ 3.

Plaintiffs participated in communal religious activities during the conference, including

communal prayers three times a day, and these collective prayers represented an important reason

behind Plaintiffs' attendance at the RIS Conference.  Atassi Decl. ¶ 6; Elshinawy Decl. ¶ 6;

Rizek Decl. ¶ 4; Shibly Decl. ¶ 6; Tabbaa Decl. ¶ 6.

Plaintiffs also participated in numerous educational activities at the conference.  Atassi

Decl. ¶¶ 3, 5, 7; Elshinawy Decl. ¶¶ 3-5; Rizek Decl. ¶¶ 3, 5; Shibly Decl. ¶¶ 3, 5, 7; Tabbaa

Decl. ¶¶ 3-5.  One popular lecture attended by several of the Plaintiffs focused on the life and

death of the Prophet Mohammad, and several of the Plaintiffs attended a lecture by renowned

American Islamic scholar Hamza Yusuf.  Elshinawy Decl. ¶ 5; Atassi Decl. ¶ 5; Shibly Decl. ¶ 5;

---

[5](...continued)
to the same IDSO to which the RIS Conference was subject to included the Muslim Public
Affairs  (MPAC) Conference, the Islamic Circle of North America (ICNA) and Muslim
American Society (MSA) joint conference, and the Islamic Society of North America (ISNA)
Conference.  *See* Website Materials (attached to Ofer Decl. as Ex. 3).

7

Rizek Decl. ¶ 5.[6]

As in past conferences, prominent Canadian government officials participated in the December 2004 Conference, including the Mayor of Toronto and Commissioner of the Royal Canadian Mounted Police. *See* Toronto Star Article (attached to Ofer Decl. as Ex. 4). Ontario Premier Dalton McGuinty included a letter in the conference program guide, stating, "On behalf of the Government of Ontario, I am delighted to extend warm greetings to everyone attending the [RIS] Conference." RIS Conference Program Book (attached to Ofer Dec. as Ex. 5).

When Plaintiffs arrived at the US-Canadian border to re-enter the United States after attending the conference, border officers selected them for special inspection immediately upon learning of Plaintiffs' attendance at the conference. Atassi Decl. ¶¶ 8-16; Elshinawy Decl. ¶¶ 8-18; Rizek Decl. ¶¶ 5-21; Shibly Decl. ¶¶ 8-25; Tabbaa Decl. ¶¶ 8-26. Border officers then subjected Plaintiffs to prolonged detention, interrogation, frisking, digital fingerprinting and photographing. *Id.* Border officers held Plaintiffs in detention for as long as six hours. *Id.*

Once detained, Plaintiffs waited for several hours while officers ignored their repeated requests for information as to why they had been ordered into detention and what would happen to them. Atassi Decl. ¶¶ 11, 16; Elshinawy Decl. ¶¶ 11-12; Rizek Decl. ¶¶ 9, 11, 14; Shibly Decl. ¶¶ 11, 13, 16, 21; Tabbaa Decl. ¶¶ 16-18, 26. In several instances, border officers acted inappropriately toward Plaintiffs, including telling them that they had no rights at the border.

---

[6] Plaintiffs also participated in cultural activities at the conference, including shopping at a bazaar that featured a wide selection of ethnic food, jewelry, clothing, books and music. Plaintiffs Atassi and Elshinawy purchased abayas, a traditional Islamic dress, at the bazaar, as well as several CD recordings of Islamic teaching. Atassi Decl. ¶ 7; Elshinawy Decl. ¶ 4. Plaintiffs Elshinawy and Tabbaa both purchased decorative pins for their hijabs. *See* Elshinawy Decl. ¶ 4; Tabbaa Decl. ¶ 4.

Atassi Decl. ¶ 11; Elshinawy Decl. ¶ 13; Tabbaa Decl. at ¶ 18.

Plaintiffs did not want to be interrogated, frisked, fingerprinted and photographed.  Atassi

Decl. ¶ 14; Elshinawy Decl. ¶¶ 15-17; Rizek Decl. ¶ 13-18; Shibly Decl. ¶¶ 18-20; Tabbaa Decl.

¶¶ 19-22.[7]  Plaintiffs understood or were told by the border officers that they would be held in

detention indefinitely unless they complied with the fingerprinting and photographing.  *Id.*

Border officers interrogated several of the Plaintiffs about the content of the RIS

Conference, their activities at the conference, and whether they met with any terrorists at the

conference.  Atassi Decl. ¶ 13; Elshinawy Decl. ¶ 13;  Rizek Decl. ¶¶ 13, 16.  Border officers

physically forced several of the Plaintiffs to be fingerprinted.  Elshinawy Decl. ¶ 17; Shibly Decl.

¶ 20; Tabbaa Decl. ¶ 22.  Officers photographed several of the Plaintiffs without their

knowledge.  Atassi Decl. ¶14; Shibly Decl. ¶20.

Not until the actual interrogation, frisking, fingerprinting and photographing did the

Plaintiffs learn what would happen to them during their detention.  Atassi Decl. ¶¶ 11, 16;

Elshinawy Decl. ¶¶ 11; Rizek Decl. ¶¶ 9, 11, 15; Shibly Decl. ¶¶ 11, 16, 21; Tabbaa Decl. ¶¶ 16-

18, 26.

The Plaintiffs want to attend this year's RIS Conference, scheduled for December 23-29

at the National Trade Center in Toronto.[8]  Atassi Decl. ¶ 18; Elshinawy Decl. ¶ 20; Rizek Decl. ¶

23; Shibly Decl. ¶ 27; Tabbaa Decl. ¶¶ 27-28; RIS Conference Website Materials (attached to

Ofer Decl. as Ex. 6).  They want to attend the conference to learn more about their religion, listen

---

[7]It appears that border officers did not photograph Plaintiff Sawsan Tabbaa.

[8]Other Islamic conferences scheduled to take place in December 2005 include the MPAC, ISNA, ICNA, and MAS conferences.  *See* Listing of Upcoming Conferences (attached to Ofer Decl. as Ex. 7).

to lectures by Islamic scholars, and meet other Muslims. *Id.* Two of the Plaintiffs have

scheduling conflicts and will be out of the country during this year's gathering, but they plan on

attending future RIS Conferences. *Id.*

All of the Plaintiffs fear being targeted once again by border officers when they return to

the United States after attending the RIS Conference. *Id.* They fear being detained, interrogated,

fingerprinted and photographed once again by border officers. *Id.*

## SUMMARY OF ARGUMENT

The federal government possesses broad authority at our nation's borders, but that

authority is not unbounded and remains subject to fundamental protections afforded by the

United States Constitution and by the laws of the United States. Specifically, our nation's

commitment to freedom of assembly and religion and freedom from unreasonable searches and

seizures remain robust at the border.

In this case, the government issued a nationwide directive last December instructing

border agents to detain everyone they could identify as returning to this country from any of

several Islamic conferences. This directive was based solely upon information indicating that a

person or persons associated with terrorism might attend one of these conferences. As a result,

thousands of law-abiding American citizens were subject to being detained, interrogated,

fingerprinted, and photographed for no reason other than having attended a religious conference.

This type of "guilt by association" dragnet is anathema to our Constitution. Just as the

Supreme Court decades ago rejected the notion that the war on communism allowed the

government to use mere participation in the Communist Party to justify indiscriminately barring

10

American citizens from certain activities -- including crossing the border -- and just as the Court

twenty-five years ago rejected the notion that the war on drugs allowed the government to seize

people simply because of their close proximity to drug activity, this Court must reject the notion

that the war on terrorism sweeps away the right of law-abiding American citizens to attend

lawful religious events simply because the government suspects that people associated with

terrorism might be attending such events.

ARGUMENT

The Plaintiffs seek a narrow preliminary injunction against use of the special

investigation policy during the upcoming RIS Conference, alleging the policy violates the First

Amendment, the Religious Freedom Restoration Act, the Fourth Amendment, and the

Administrative Procedure Act.   To obtain such relief, the plaintiffs must demonstrate

"irreparable harm in the absence of an injunction and a likelihood of success on the merits."

*Latino Officers Ass'n v. City of New York*, 196 F.3d 458, 462 (2d Cir. 1999) (affirming

preliminary injunction in a First Amendment dispute), *cert. denied*, 528 U.S. 1159 (2000).

With respect to the requirement of irreparable harm, violations of the First and Fourth

Amendment are considered irreparable as a matter of law. *Latino Officers Ass'n*, 196 F.3d at

462 ("Violations of First Amendment rights are commonly considered irreparable injuries for the

purposes of a preliminary injunction," internal quotations and citations omitted); *Covino v.*

*Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (holding that violation of Fourth Amendment right

against unreasonable searches constitutes irreparable harm for purposes of preliminary

injunction).  As for the likelihood of success requirement, the Second Circuit has set forth two

11

standards, one requiring only "a showing that the probability of [the plaintiff] prevailing is better

than fifty percent," *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988); and the other requiring a

heightened showing of "clear" or "substantial" likelihood of success, *Jolly v. Coughlin*, 76 F.3d

468, 473 (2d Cir. 1996) (affirming award of preliminary injunction for claim under the RFRA).

Even if the more demanding standard applied, the Plaintiffs are entitled to the limited preliminary

injunctive relief they seek on each of their claims, for the reasons set out below.

## I. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR CLAIM THAT DEFENDANTS' POLICY OR PRACTICE VIOLATES THEIR FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH AND ASSOCIATION.

Plaintiffs' participation in a religious conference plainly is expressive activity that lies at

the core of the First Amendment.  As the Supreme Court has noted, "We have long understood as

implicit in the right to engage in activities protected by the First Amendment a corresponding

right to associate with others in pursuit of a wide variety of political, social, economic,

educational, religious and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622

(1984) (collecting cases). *Accord NAACP v. Alabama*, 357 U.S. 449, 460-61 (1958) (discussing

critical role of right to participate in group activity).

Nearly seventy years ago the Supreme Court recognized that the First Amendment bars

the government from penalizing mere participation in an expressive assembly, even if there is

reason to believe that others associated with the assembly might be engaged in unlawful activity

intended to undermine if not destroy the nation.  In *DeJonge v. Oregon*, 299 U.S. 353 (1937), the

Court declared unconstitutional the criminal conviction of a member of the Communist Party

under Oregon's "criminal syndicalism" statute, which prohibited, among other things, "presiding

at or assisting in conducting a meeting" of a group "which advocates crime, physical violence,

sabotage or any unlawful acts or methods as a means of accomplishing or effecting industrial or

political change or revolution." *Id.* at 357.  The defendant was convicted solely for having

spoken at a public meeting sponsored by the Communist Party without further evidence that he

had engaged in any unlawful activity. *See id.* at 358-59.  Though this case came to the Supreme

Court well before the development of modern, expansive First Amendment protections, the

Court did not hesitate to invalidate the conviction and in doing so expressly held, in language

that has particular relevance to contemporary concerns about terrorism, that the First Amendment

barred such "guilt-by-association" penalties on First Amendment activity:

> The greater the importance of safeguarding the community from incitements to
> the overthrow of our institutions by force and violence, the more imperative is the
> need to preserve inviolate the constitutional rights of free speech, free press and
> free assembly in order to maintain the opportunity for free political discussion, to
> the end that government may be responsive to the will of the people and that
> changes, if desired, may be obtained by peaceful means.  Therein lies the security
> of the Republic, the very foundation of constitutional government.
>
> It follows from these considerations that, consistently with the Federal
> Constitution, peaceable assembly for lawful discussion cannot be made a crime.
> The holding of a meeting for peaceable political action cannot be proscribed.
> Those who assist in the conduct of such meetings cannot be branded as criminals
> on that score.  The question, if the rights of free speech and peaceable assembly
> are to be preserved, is not as to the auspices under which the meeting is held but
> as to its purpose; not as to the relations of the speakers, but whether their
> utterances transcend the bounds of the freedom of speech which the Constitution
> protects.  If the persons assembling have committed crimes elsewhere, if they
> have formed or are engaged in a conspiracy against the public peace and order,
> they may be prosecuted for their conspiracy or other violations of valid laws.  But
> it is a different matter when the State, instead of prosecuting them for such
> offenses, seizes upon mere participation in a peaceable assembly as a basis for a
> criminal charge.

299 U.S. at 365.  *Accord NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 925 (1982) ("To

impose liability for presence at weekly meetings of the NAACP would -- ironically -- not even

constitute 'guilt by association,' since there is no evidence that the association possessed

unlawful aims. Rather, liability could only be imposed on a 'guilt *for* association' theory. Neither

is permissible under the First Amendment").

Consistent with this view of the First Amendment, the Supreme Court thirty years later

held in *United States v. Robel* that compelling national-security concerns could not justify a

federal statute that indiscriminately barred all Communist Party members from employment in

defense-related industries. *See* 389 U.S. 258 (1967). As the Court explained, "The statute quite

literally establishes guilt by association alone, without any need to establish that an individual's

association poses the threat feared by the Government in proscribing it. The inhibiting effect on

the exercise of First Amendment rights is clear." *Id.* at 265 (footnote omitted). In so holding, the

Court expressly noted that the invocation of "national defense" could not justify sweeping

burdens on First Amendment activity:

> [T]his concept of 'national defense' cannot be deemed an end in itself, justifying any
> exercise of legislative power designed to promote such a goal. Implicit in the term
> 'national defense' is the notion of defending those values and ideals which set this Nation
> apart. For almost two centuries, our country has taken singular pride in the democratic
> ideals enshrined in its Constitution, and the most cherished of those ideals have found
> expression in the First Amendment. It would indeed be ironic if, in the name of national
> defense, we would sanction the subversion of one of those liberties – the freedom of
> association – which makes the defense of the Nation worthwhile.

*Id.* at 264.

Given these rulings – and the basic precepts of the First Amendment that they articulate –

the First Amendment plainly would bar the government from stopping, detaining, interrogating,

fingerprinting, and photographing every person leaving a religious conference in this country

merely because law-enforcement authorities had reason to believe that a person or persons

associated with terrorism might be attending any one of several religious conferences taking

place during the same period of time.  That is precisely what happened here, with one wrinkle:

the religious conference in question took place outside the United States.  The only question,

therefore, is whether the fact that the RIS Conference does not take place in this country

fundamentally changes the First Amendment analysis.  Long-standing case law holds to the

contrary.

Three years before deciding *Robel*, the Supreme Court addressed the extent to which the

government could place restrictions on movement across the border based upon participation in

First Amendment activity.  In *Aptheker v. Secretary of State*, 378 U.S. 500 (1964), the Court

considered the constitutionality of a provision of the Subversive Activities Control Act that

forbade American citizens from getting U.S. passports solely because they were members of the

Communist Party.  At the outset of its constitutional analysis, the Court acknowledged the

government's contention that the restriction was prompted by concerns about national security

but made clear the limits of such a contention:

> The government emphasizes that the legislation in question flows, as the statute
> itself declares, from the congressional desire to protect our national security.  That
> Congress under the Constitution has power to safeguard our Nation's security is
> obvious and unarguable.  As we said in *Mendoza-Martinez*, "while the
> Constitution protects against invasions of individual rights, it is not a suicide
> pact."  At the same time the Constitution requires that the powers of government
> "must be so exercised as not, in attaining a permissible end, unduly infringe" a
> constitutionally protected freedom.

378 U.S. at 509 (citations omitted).

In light of this requirement that restrictions not "unduly infringe" on constitutional

guarantees, the Court then struck down the statute because of its indiscriminate treatment of

those associated with the Communist Party.  Specifically, the statute failed to distinguish

between those who might be active members of the party and engaged in unlawful activity and

other members engaged in lawful conduct. *See id.* at 509-10. Similarly, it failed to distinguish between party members seeking to travel for unlawful reasons and those seeking to travel for "wholly innocent purposes." *See id.* at 510-12 (footnote omitted). As the Court noted during its analysis, "Indiscriminate classification of innocent with knowing activity must fall as an assertion of arbitrary power." *Id.* at 510 (quotations and citation omitted).[9]

Further undermining any suggestion that First Amendment rights are substantially diluted at the border is the Court's decision in *Lamont v. Postmaster General*, 381 U.S. 301 (1965). There the Court invalidated on First Amendment grounds a federal statute prohibiting delivery of foreign mail that constituted "communist political propaganda" unless the American recipient requested delivery in writing. In doing so, the Court invoked a series of domestic First Amendment cases, neither drawing nor suggesting any distinction between the rules governing such cases and those governing expressive activity that implicated the border. *See id.* at 305-07.

Finally, a number of lower court cases have applied traditional First Amendment protections to border disputes. *United States v. Ramon*, 86 F. Supp.2d 665 (W.D. Tex. 2000), held that border authorities' reliance on a driver's display of religious symbols to formulate reasonable suspicion for a search violated the First Amendment. *Church of Scientology of Calif. v. Simon*, 460 F. Supp. 56 (C.D. Cal. 1978), *summarily affirmed*, 441 U.S. 938 (1979), upheld a statute permitting customs to restrict imports and conduct searches for documents that advocate treason or insurrection, but only by reading into the statute the restrictions set forth in

---

[9]Similarly, *Kent v. Dulles*, 357 U.S. 116 (1958), struck down an earlier version of the Communist exclusion. Although the Court's holding was that Congress had not authorized the Secretary of State's regulations, the rationale was essentially constitutional. The Court noted that the case dealt "with beliefs, with associations, with ideological matters . . . [citizens] are being denied their freedom of movement solely because of their refusal to be subjected to inquiry into their beliefs and associations." *Id.* at 130.

*Brandenberg v. Ohio*, which defines the line between protected speech and unprotected words that incite imminent violence. While expressly acknowledging the breadth of customs authorities' power at the border, *id.* at 58-59, the court applied usual First Amendment standards to judge the constitutionality of the government's actions. A decade later, that court relied on the First Amendment to place additional restrictions on the same "treasonous writings" statute. In *Heidy v. U.S. Customs Service*, 681 F. Supp. 1445, 1450 (C.D. Cal. 1988), the court held that the First Amendment prohibited the government from retaining any documents or records obtained during a border search once a determination was made that seized documents did not violate the statute. The possibility that the government could read a person's politically-oriented documents and keep records of people who carry anti-government papers chilled First Amendment rights and went beyond the interests that justified the initial border seizure. In the court's words, "the border search exception to the fourth amendment ends at the point at which . . . the substantial encroachment on [plaintiffs'] first amendment rights begins." *Id.* at 1449.

The First Amendment bars the government from singling people out for punitive treatment simply because of their participation in lawful First Amendment activity, even if others involved with that activity may have engaged in unlawful activity. That principle does not disappear at the border.

Here, however, the Plaintiffs -- and thousands of others -- were singled out for detention and "inspection" simply because they had attended a religious conference. The government had no reason to suspect any unlawful activity on their part and instead acted solely because it believed others engaged in unlawful activity might attend a conference similar to the one attended by the Plaintiffs. As the Supreme Court's decisions in cases such as *DeJonge*,

*Claiborne Hardware, Robel*, and *Aptheker* make clear, however, such a "guilt-by-association"

dragnet – even at the border – is unconstitutional, no matter how legitimate the government's

general concerns about terrorism.

## II.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR CLAIM THAT THE GOVERNMENT'S POLICY OR PRACTICE VIOLATES THE FIRST AMENDMENT'S FREE EXERCISE CLAUSE AND THE RELIGIOUS FREEDOM RESTORATION ACT.

In addition to violating the Plaintiffs' right to freedom of speech and association, the

Defendants' policy violates the Plaintiffs' right to freedom of religion, as protected by the First

Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*[10]

This provides an independent basis for a preliminary injunction.

Plaintiffs pursuing freedom of religion claims under either the First Amendment or RFRA

bear a modest burden in establishing that their activity is religious.  *See Jolly v. Coughlin*, 76

F.3d 468, 476 (2d Cir. 1996) (holding that in determining whether religious conduct or belief is

protected under RFRA, the court's "scrutiny extends only to whether a claimant sincerely holds a

particular belief and whether the belief is religious in nature."); *Fifth Ave. Presbyterian Church v.

City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) ("An individual claiming a violation of free

exercise rights need only demonstrate that the beliefs professed are sincerely held and in the

individual's own scheme of things, religious.") (internal quotation omitted).  And there can be no

---

[10] Although the Supreme Court ruled that RFRA is invalid as applied against the States, *Boerne v. City of Flores*, 521 U.S. 507 (1997), RFRA continues to apply against the federal government, as the government recently acknowledged in a brief submitted to the Supreme Court.  Brief for the Petitioners at 4, *Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal*, No. 04-1084, 2005 WL 1650792, 125 S. Ct. 1084 (2005) (stating the "RFRA applies to all Federal law and the implementation of that law")(internal quotation marks omitted).

question but that the Plaintiffs' participation in the RIS Conference meets this standard, as they

attended the 2004 RIS Conference in order to learn more about their religion and actually

participated in religious services while at the conference. *See infra* at 7-8.

Similarly, demonstrating that government action imposes a substantial burden on

religious practice "is not a particularly onerous task." *McEachin v. McGuinnis*, 357 F.3d 197,

202 (2d Cir. 2004). *See also Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003) (rejecting strict

definition of "substantial burden" that "would require claimants to show that they either have

been prevented from doing something their religion says they must, or compelled to do

something their religion forbids"). There can be little doubt but that subjecting those returning

from a religious conference to being detained, interrogated, fingerprinted, and photographed

amounts to a sufficiently substantial burden to trigger the protections of the free exercise clause

and RFRA. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (finding substantial burden where

individual is forced to "choose between following the precepts of her religion and forfeiting

benefits, on the one hand, and abandoning one of the precepts of her religion . . ., on the other

hand."); *Jolly*, 76 F.3d at 468 (explaining that detaining prisoner in cell for even "a short period

of time" unless he consented to undergo medical test contrary to his religion would be substantial

burden under RFRA); *Ramon*, 86 F. Supp.2d at 677 ("The policy of targeting vehicles displaying

religious symbols imposes a substantial burden upon the faithful who wish to proclaim their

beliefs on the bumper of their car.").

Given that participation in the RIS Conference is a form of religious activity and given

that the government's policy substantially burdens that activity, that policy is subject to strict

scrutiny, either under the First Amendment as a policy not neutral to religious practice or under

19

RFRA as a policy of general applicability. *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993) (holding that "a law burdening religious practice that is not neutral must undergo the most rigorous of scrutiny" and "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests"); § 2000bb-1(a) (providing that government may not "substantially burden [Plaintiffs'] exercise of religion even if the burden results from a rule of general applicability" unless Defendants demonstrate that the application of that burden onto Plaintiffs is "in furtherance of a compelling government interest" and "the least restrictive means of furthering that compelling governmental interest.").

However sincere the government's concerns about terrorism, its policy of targeting for detention and "inspection" thousands of American citizens whose only "crime" is to attend a religious conference plainly cannot meet strict scrutiny, as it is not narrowly focused on people actually suspected of terrorism. *See, e.g., Jolly*, 76 F.3d at 479-80 (holding that detention violated RFRA because not the least restrictive method for addressing government concern).

### III. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR CLAIM THAT THE GOVERNMENT'S POLICY OR PRACTICE VIOLATES THE FOURTH AMENDMENT.

In addition to their freedom of assembly and freedom of religion claims, the Plaintiffs' request for a preliminary injunction is supported by the Fourth Amendment. While the government has broad authority under the Fourth Amendment to conduct a limited category of "routine" inspections of persons and things crossing the border without individualized suspicion, searches and seizures involving extended detentions and investigations must be supported by individualized reasonable suspicion. *See United States v. Montoya de Hernandez*, 473 U.S. 531,

20

540-41 (1985) (requiring reasonable suspicion to "justify a seizure of an incoming traveler for purposes other than a routine border search"); *United States v. Charleus*, 871 F.2d 265, 267 (2d Cir. 1989) (holding that routine searches of personal belongings and effects are permissible without suspicion, but "[m]ore intrusive border searches . . . require at a minimum reasonable suspicion of criminal activity.").

The Second Circuit has recognized that Americans should expect to have their luggage, vehicles and personal effects inspected as they cross the border and has therefore found that such searches and seizures fall into the category of "routine" actions that do not require any particular level of suspicion as a prerequisite. *See Charleus*, 871 F.2d at 267 (holding that a simple pat-down search is "routine"). The court has also recognized, however, that American citizens do not, and should not, expect to be subjected to more intrusive searches and prolonged seizures absent individualized suspicion of wrongdoing. *See United States v. Sanders*, 663 F.2d 1, 3 (2d Cir. 1981) (holding reasonable suspicion required before border agents could search a person's artificial limb because that inspection "extends beyond routine inspection of belongings and effects"); *United States v. Asbury*, 586 F.2d 973, 976-76 (2d Cir. 1978) (holding that, "although anyone entering or leaving the country may expect to have his luggage and personal effects examined," strip search required individualized suspicion); *see also United States v. Ventura*, 947 F. Supp. 25, 30-31 (D.P.R. 1996) (holding "[f]ocused questioning for nearly an hour and a half [during Customs inspection at border] is not routine nor is it a mere inconvenience" and suppressing statements).

Defendants' own documents and statements demonstrate that their actions toward Plaintiffs exceeded the boundaries of a routine secondary inspection. Plaintiffs were singled out

21

for special processing not as part of any routine customs or immigration inquiry, but pursuant to

a special enforcement operation related to concerns about terrorism.  Jacksta Deposition 165:14-

167:1; 182:3-13; 193:6-194:11; Muster - IDSO 2005-06.  In executing this special directive from

Washington, Plaintiffs were processed as under the "APV" system – Anti-Terrorism Passenger

Validation – not pursuant to routine secondary inspection procedures.  Talking Points Document

(Bates No. DHS/CBP 296); OFO Morning Summary Follow Up (Bates No. DHS/CBP 299);

D'Ambrosio Decl. at ¶ 5 (stating that Plaintiffs were processed as "known or suspected

terrorists" and that "when such an individual is encountered, the operating procedures provide for

a more detailed inspection of the individual, including questioning, a personal search,

fingerprinting and photographing of the individual, and a vehicle search.").

     In particular, the forcible fingerprinting and photographing of U.S. citizens at the border

is not part of a routine border search.  CBP's own regulations state that fingerprinting and

photographing only may occur if agents can identify some basis for such actions, clearly

removing this tool from the panoply of "routine" measures encountered by every citizen in

secondary inspection.  *See* IDENT/IAFIS Standard Operating Procedure (Bates DHS/CBP 346-

47) (attached to Stoughton Declaration as Ex. 11) (instructing CBP officers to use fingerprinting

and photographing system only where they have "at least one articulable fact" supporting

suspicion of inadmissibility).  Defendant's witnesses testified that CBP does not take fingerprints

as part of the routine secondary inspection process.  *See* Caltagirone Deposition 68:9-15; 79:19-

80:3.

     Because the prolonged detention, special interrogation, fingerprinting and photographing

of Plaintiffs went beyond the scope of a routine border search, those actions must be supported

by reasonable suspicion in order to meet the reasonableness requirement of the Fourth Amendment.[11]  Reasonable suspicion requires a particularized and objective basis to suspect the traveler of criminal activity.  *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002); *Terry v. Ohio*, 391 U.S. 1 (1968).  This is as true at the border as it is in the nation's interior.  *See Montoya de Hernandez*, 473 U.S. at 541 (holding that non-routine detention of a traveler at the border requires "a particularized and objective basis for suspecting the particular person of [criminal activity].") (internal quotation omitted); *Sanders*, 663 F.2d at 3 ("[W]hen a border search extends beyond routine inspection of belongings and effects, 'reasonableness is determined by weighing the warranted suspicion of the border official against the offensiveness of the intrusion.'") (quoting *Asbury*, 586 F.2d at 976).

Here, the only basis for detaining and "inspecting" the Plaintiffs was the fact that they had attended one of several religious conferences when the government believed that others involved with terrorist activity might attend one of these conferences.  The Supreme Court has squarely rejected the notion that even far more direct "association" is sufficient to provide reasonable suspicion for a law-enforcement detention and search.  In *Ybarra v. Illinois* the Court ruled that the Fourth Amendment was violated when police officers possessing a search warrant to search a bar and one of its employees for evidence of unlawful drug activity also detained and searched another person inside the bar.  *See* 444 U.S. 85, 90-96 (1979).  As the Court explained, "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."  *Id*. at 91.

---

[11]Outside of the border context, the Supreme Court has held that law enforcement agents must, at a minimum, have reasonable suspicion to detain a person for the purpose of taking fingerprints. *Hayes v. Florida*, 470 U.S. 811, 817 (1985) (holding unconstitutional an investigative detention for the purpose of obtaining fingerprints).

23

The Second Circuit has recognized that *Ybarra*'s prohibition on guilt by propinquity applies at the border. *See United States v. Tehrani*, 49 F.3d 54, 59 (2d Cir. 1995) (analyzing border-stop claim under *Ybarra* analysis).   And that prohibition applies even more strongly in this situation than it did in *Ybarra*, as the "propinquity" between the Plaintiffs and those about whom the government was concerned was much more attenuated.   At closest, the Plaintiffs were five of more than 10,000 people at a lawful religious conference – and may have been just five of tens of thousands of people attending several Islamic conferences.   Under *Ybarra*, this type of "association" is insufficient to create the reasonable suspicion required to permit government officials to detain, frisk, fingerprint, and photograph the plaintiffs.[12]

## IV.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR CLAIM THAT DEFENDANTS' POLICY OR PRACTICE  VIOLATES THE ADMINISTRATIVE PROCEDURE ACT.

Defendants' policy also exceeds their statutory authority, in violation of the Administrative Procedure Act, ("APA") 5 U.S.C. § 551 *et seq*. *See* 5 U.S.C. § 706(2)(C) (requiring court to "hold unlawful and set aside agency action, . . . found to be in excess of statutory jurisdiction, authority, or limitations").  Congress has established a detailed statutory regime that both authorizes and delimits CBP conduct at the border.[13]  Defendants have justified

---

[12]Moreover, reasonable suspicion may not be based on "broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121, 1124-27 (9th Cir. 2002) (internal quotation omitted).

[13]*See United States v. Diamond*, 471 F.2d 771, 773 (9th Cir. 1973) ("[C]ustoms agents are not general guardians of the public peace . . . . Their power to search places and arrest persons are limited by statute."). Courts have repeatedly adjudicated challenges to customs searches to ensure conformity with customs law. *See, e.g., United States v. 1903 Obscene Magazines*, 907 F.2d 1338 (2d Cir. 1990); *United States v. Nunes*, 511 F.2d 871 (1st Cir. 1975).

24

their policy in this case as authorized by a "wide array of statutes covering numerous policy areas under which it may stop, search or examine any person or vehicle entering the United States." Def. Response to Pl. First Set of Interrogatories at 4 (citing customs statutes) (attached to Stoughton Declaration as Ex.13; *see also id.* at 5 (referencing immigration regulation).[14]

By their plain terms, however, none of the customs statutes invoked by the government, nor the single immigration regulation, permits the policy or practice of detaining, interrogating, and forcibly fingerprinting and photographing United States citizens for a purpose <u>unrelated</u> to a customs or immigration inspection.  And in this case, it is undisputed that Defendants detained Plaintiffs for reasons unrelated to a customs or immigration inspection.  Because "[t]he powers of the Customs Service . . . are usually limited to violations of customs laws," *United States v. Diezel*, 608 F.2d 204, 206 (5th Cir. 1979), Defendants' policy or practice is <u>ultra</u> <u>vires</u> and violates the APA.  *See United States v. Nunes*, 511 F.2d 871 (1st Cir. 1975) (upholding APA claim that customs officials exceeded their statutory authority in searching plane that made emergency landing in Puerto Rico).

CONCLUSION

For all the foregoing reasons, the Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

---

[14] Several statutes invoked by Defendants are plainly irrelevant.  <u>See</u> 19 U.S.C. § 1455 (placement of customs officers on vessels); <u>id</u>. § 1499(a)(1) (retention of merchandise until inspected and duties paid); <u>id</u>. § 1559 (government sale of goods abandoned in bonded warehouse); <u>id</u>. § 1582 (promulgation of customs regulations); <u>id</u>. § 1461 (authority to search vehicle).  In its motion to dismiss, now withdrawn, the government also contended that immigration statutes authorized its conduct in this case.  Def.'s Mem. of Law in Support of Mtn. To Dismiss at 18.

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
   FOUNDATION, by

CHRISTOPHER DUNN
COREY STOUGHTON
UDI OFER
ARTHUR EISENBERG
DONNA LIEBERMAN
125 Broad Street, 17th Floor
New York, N.Y.  10004
(212) 344-3005

CATHERINE KIM
American Civil Liberties Union
125 Broad Street, 17th Floor
New York, N.Y.  10004
(212) 549-2500

ARSALAN IFTIKHAR
KHURRUM WAHID
Council on American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C.  20003
(202) 488-8787

MICHAEL WISHNIE
245 Sullivan Street, 5th Floor
New York, N.Y.  10012
(212) 988-6430
NYCLU Cooperating Attorney

DAVID JAY
69 Delaware Avenue
Suite 1103
Buffalo, N.Y. 14202
(716) 856-6300

Dated: November 28, 2005
     New York, N.Y.

26

On the brief:   Daniel Freeman, Law student intern
                Murad Hussain, Law student intern
                Rizwan Sabar, Law student intern
                Allard K. Lowenstein International Human Rights Clinic,
                    National Litigation Project, Yale Law School

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2005, I served by email and United States First Class Mail the attached PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION, on the following counsel of record:

> Anthony J. Coppolino
> Special Litigation Counsel
> United States Department of Justice
> Civil Division, Federal Programs Branch
> Room 6102
> 20 Massachusetts Ave., NW
> Washington, DC  20530
>
> Mary K. Roach
> Assistant United States Attorney
> United States Attorney's Office
> Western District of Buffalo
> 138 Delaware Avenue
> Buffalo, New York 14202

CHRISTOPHER DUNN