UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____x
SAWSAAN TABBAA, HASSAN SHIBLY,          :
ASMAA ELSHINAWY, KAREMA ATASSI,         :
and GALEB RIZEK,                         :
                                         :
            Plaintiffs,                   :
                                         :      Case No. 1:05-CV-582(S)
      -versus-                            :
                                         :
MICHAEL CHERTOFF, Secretary of the United :
States Department of Homeland Security;   :
ROBERT C. BONNER, Commissioner of the     :
United States Customs and Border Protection; :
MICHAEL D'AMBROSIO, Director of Field     :
Operations in Buffalo, United States Customs and :
Border Protection; and JOSEPH J. WILSON,  :
Buffalo Port Director for the United States Customs :
and Border Protection,                    :
                                         :
            Defendants.                   :
_____x


# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
   FOUNDATION, by

CHRISTOPHER DUNN
COREY STOUGHTON
UDI OFER
ARTHUR EISENBERG
125 Broad Street, 17th Floor
New York, N.Y.  10004
(212) 344-3005

CATHERINE KIM
American Civil Liberties Union Foundation
125 Broad Street, 17th Floor
New York, N.Y. 10004
(212) 549-2500

ARSALAN IFTIKHAR
KHURRUM WAHID
Council on American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C. 20003
(202) 488-8787

MICHAEL WISHNIE
245 Sullivan Street, 5th Floor
New York, N.Y. 10012
(212) 988-6430
NYCLU Cooperating Attorney

DAVID JAY
69 Delaware Avenue
Suite 1103
Buffalo, N.Y. 14202
(716) 856-6300

Dated: December 9, 2005
        New York, N.Y.

On the brief:   Daniel Freeman, Law student intern
                Murad Hussain, Law student intern
                Rizwan Sabar, Law student intern
                Allard K. Lowenstein International Human Rights Clinic,
                    National Litigation Project, Yale Law School

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.      THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CONTENTION THE PLAINTIFFS LACK STANDING TO PURSUE ANY OF THEIR CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Plaintiffs Have Standing for an Injunction Requiring the Expungement of Information Maintained by Defendants . . . . . . . . . . . . . 8

        B.      The Plaintiffs Have Standing to Seek Injunctive Relief Against the Policy and Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    II.     THE GOVERNMENT HAS NOT SOUGHT SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AMENDMENT CLAIMS . . . . . . . . . . . . . . . . . . . . . 12

    III.    THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FOURTH AMENDMENT CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    IV.    THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM UNDER THE RELIGIOUS FREEDOM RESTORATION ACT . . . . . . . . . . . . . . . . . . . . . . . 20

    V.     THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM UNDER THE ADMINISTRATIVE PROCEDURE ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CASES

40 Gardenville, LLC v. Travelers Property Casualty of America,
    387 F. Supp.2d 205 (W.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Bradley v. United States, 299 F.3d 197 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bronx Household of Faith v. Board of Education of the City of New York,
    01 Civ. 8598, 2005 WL 3071369 (S.D.N.Y., Nov. 16, 2005) . . . . . . . . . . . . . . . . . . . . . 2

Caban v. United States, 671 F.2d, 1230 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Church of the Lukumi Babalu Aye v. City of Hialeah,
    508 U.S. 520 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

City of Los Angeles v. Lyons, 461 U.S. 95, 106 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Davis v. Mississippi, 394 U.S. 721 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

DeShawn E. v. Safir, 156 F.3d 340 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

Drake v. Federal Aviation Administration,
    291 F.3d 59 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Ford v. McGinnis, 352 F.3d 582 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Francis v. Keane, 888 F. Supp. 568 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Frasier v. HHS., 779 F. Supp. 213 (N.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Friends of the Earth, Inc. v. Laidlaw,
    528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Hayes v. Florida, 470 U.S. 811 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hedgepeth v. Washington Metro. Area Transit Auth.,
    386 F.3d 1148 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Hindes v. FDIC,

1995 U.S. Dist. LEXIS 2328, at *3 (E.D. Pa. Feb. 28, 1995) . . . . . . . . . . . . . . . . . . . . . 24

Jolly v. Coughlin, 76 F.3d 468 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Jones v. Murray, 962 F.2d 302 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

McEachin v. McGuinnis, 357 F.3d 197 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

McIntyre v. Ohio Elections Comm'n,
514 U.S. 334 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

NAACP v. Alabama ex rel. Patterson,
357 U.S. 449 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Olson v. United States (The Atlantic),
68 F.2d 8  (2d Cir. 1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Red Lake Band of Chippewa Indians v. United States,
800 F.2d 1187 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Scanwell Laboratories, Inc. v. Thomas,
521 F.2d 941 (D.C. Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Shain v. Ellison, 356 F.3d 211 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Sherbert v. Verner, 374 U.S. 398 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Sweet v. Sheahan, 235 F.3d 80 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Thomas v. Review Bd. of the Indiana Employment Sec. Div.,
450 U.S. 707 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. 16.03 Acres of Land,
26 F.3d 349 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

United States v. Adler, 520 F. Supp. 313 (E.D.N.C. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Asbury, 586 F.2d 973 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Bravo, 295 F.3d 1002 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Charleus, 871 F.2d 265 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 13, 14, 17

United States v. Esieke, 940 F.2d 29 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Espericueta Reyes,
     631 F.2d 616 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Flores-Montano,
     541 U.S. 149 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

United States v. Gaviria, 805 F.2d 1108 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Grotke, 702 F.2d 49 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Jerome-Oboh,
     883. F. Supp.917 (W.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Johnson, 991 F.2d 1287 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Montoya de Hernandez,
     473 U.S. 531 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 17

United States v. Moody, 649 F.2d 124 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

United States v. Ogberaha, 771 F.2d 655 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Ramon, 86 F. Supp.2d 665 (W.D. Tex 2000) . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Sanders, 663 F.2d 1 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Soto-Teran,
     44 F. Supp.2d 185 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Taylor, 934 F.2d 218 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Turner, 639 F. Supp. 982 (E.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Vega-Barvo, 729 F.2d 1341 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . 15, 18

United States v. Williams, 617 F.2d 1063 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Utility Workers Union of America v. NRC,
     664 F. Supp. 136 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Vives v. City of New York, 305 F. Supp.2d 289 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . 8

<u>Watchtower Bible & Tract Society of N.Y. v. Village of Stratton</u>,
    536 U.S. 150 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>STATUTES</u>

19 U.S.C. § 482 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

19 U.S.C. § 1455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

19 U.S.C. § 1461 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

19 U.S.C. § 1467 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

19 U.S.C. §  1581 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Administrative Procedure Act ,
    5 U.S.C. § 551 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 23, 24, 25

Religious Freedom Restoration Act
    42 U.S.C. § 2000bb(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20, 21, 22

# PRELIMINARY STATEMENT

This case challenges a government policy under which thousands of law-abiding American citizens about whom the government has no suspicion of wrongdoing are subject to being detained, interrogated, fingerprinted, and photographed merely for attending a religious conference. Under this policy, the United States Department of Homeland Security ("DHS") issued a directive to border officials in New York, Los Angeles, Seattle, North Dakota, Detroit, and the Caribbean to stop and divert for special investigation every person officials could identify as returning from any of several Islamic conferences taking place during December 2004.

Just over one month after discovery commenced in this matter and with only limited discovery having been completed, the government has moved for summary judgment. As discussed in a separate motion filed under Rule 56(f), the record is not sufficiently complete at this point for this Court to rule on summary judgment. As for the partial record that is before the Court, an examination of it – which of course must be undertaken drawing all reasonable inferences in favor of the plaintiffs – reveals that no basis exists for summary judgment. This conclusion is particularly apparent in light of the documents produced under order by the government just last week, which further weaken the factual assertions upon which the government relies in its motion for summary judgment.

## STATEMENT OF FACTS

As this Court has observed on many occasions, "[i]n deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be 'viewed in the light most favorable to the party opposing the motion.'" *40 Gardenville, LLC v. Travelers Property Casualty of America*, 387 F. Supp.2d 205, 210 (W.D.N.Y. 2005) (quoting and citing *Adickes v.*

*S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

In conjunction with their motion for preliminary injunction, which also is pending before this Court, plaintiffs submitted affidavits and spelled out the facts of this case as known at that time. *See* Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction ("Plaintiffs' Prelim. Inj. Mem.") at 2-10 (Nov. 28, 2005). Rather than resubmit those same materials and repeat that discussion, plaintiffs expressly incorporate that evidentiary material into this opposition, *see Bronx Household of Faith v. Bd. of Educ. of the City of New York*, 01 Civ. 8598, 2005 WL 3071369 (S.D.N.Y., Nov. 16, 2005) ("Because summary judgment searches the record, the affidavits submitted on the preliminary injunction motion also may be considered."), and respectfully direct the Court to the discussion of the facts in their legal memorandum. Since the government now has moved for summary judgment, its motion must be adjudicated taking as true all those facts as well as all reasonable inferences to be drawn from them in favor of plaintiffs as the nonmoving party.

Given this standard and given the newly disclosed documents, it is important to focus on several factual assertions in the government's brief. Most importantly, there is the basis for defendants' actions. The government states that it acted on the basis of intelligence indicating that persons involved in terrorism would attend the RIS Conference so as to engage in specific activities in furtherance of terrorist goals. *See* Memorandum in Support of Defendants' Motion for Summary Judgment ("Def.'s Mem.") at 4-5 (Nov. 29, 2005). The record before this Court depicts a very different situation.

First, there is the question of whether the intelligence was specific to the RIS Conference. In their preliminary injunction motion, plaintiffs, relying upon the deposition testimony of DHS

official Robert Jacksta, contended that the government subjected plaintiffs and potentially thousands of others to special examination merely on the basis of intelligence indicating that a person or persons believed to be associated with terrorism might attend one of several Islamic conferences taking place in December 2005. *See* Plaintiffs' Prelim. Inj. Mem. at 2-6. As noted in plaintiffs' memorandum, Mr. Jacksta's testimony indicated that the intelligence was not specific to the RIS Conference. *See id*. at 2-3 (citing Jacksta Depo. at 152:11-158:8; Decl. of Michael D'Ambrosio (July 29, 2005)).

In their motion for summary judgment, the government takes a very different approach. At the outset, it contends that "[d]uring the holiday season of 2004-2005, Customs and Border Protection ("CBP") had specific concerns about certain national and international conferences, including the RIS Conference." Def.'s Mem. at 4 (citing Jacksta Decl. ¶ 5). From that point forward, the government drops all reference to "certain national and international conferences" and treats its policy and practices as relating specifically to the RIS Conference. *See* Def.'s Mem. at 5. This is improper. Given Mr. Jacksta's deposition testimony, the government's motion for summary judgment must be decided with the understanding that the intelligence was not particular to the RIS Conference but instead pertained more generally to a group of Islamic conferences taking place in December 2004.

Next, the government attempts to suggest that the intelligence indicated not only that certain people might attend these conferences but further that "CBP had reason to believe that the 2004 RIS Conference would serve as a possible meeting point for terrorists to exchange ideas and documents, coordinate operations, and raise funds intended for terrorist activities." Def.'s Mem. at 4 (citing Jacksta Decl. ¶ 5). However, in his deposition Mr. Jacksta, when pressed

about the extent to which the intelligence may have gone beyond the prospect that persons of concern might attend an Islamic conference, could say nothing more. Jacksta Depo. at 221:9-224:15 (attached to PI Stoughton Decl. as Ex. 2). Given this deposition testimony, the government's motion must be adjudicated with the understanding that the intelligence the government had indicated nothing more than that persons of concern might attend an Islamic conference in December 2004.

One final significant point about the intelligence arises from the documents produced by the government last week. Whereas Mr. Jacksta states in his declaration that, based on the intelligence, "CBP had reason to believe that certain individuals who were associated with terrorist organizations or activities . . . would be in attendance at the 2004 RIS Conference," Jacksta Declaration ¶ 5,



Given all this and the standards governing the treatment of facts on summary judgment,

the government's motion cannot be decided on the factual contention on which it is premised: that the government acted in response to intelligence that persons associated with terrorism were planning to attend the RIS Conference to exchange ideas and documents, coordinate operations, and raise funds for terrorist activities.  Indeed, drawing all inferences in favor of plaintiffs, the evidence shows only that ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████

Beyond mischaracterizing the basis for its actions, the government omits many significant facts that bear on the merits of its motion and in some instances misstates the material facts. These additional points are discussed in the specific arguments set out below.

## SUMMARY OF ARGUMENT

The government's motion contends that the plaintiffs lack standing to pursue any relief; cannot establish a violation of the Fourth Amendment because what happened to them at the border was routine and thus reasonable; cannot establish a violation of the Religious Freedom Restoration Act ("RFRA") because they have not alleged a policy that implicates the statute and if they did the statute was not violated; and cannot establish a violation of the Administrative Procedures Act ("APA") because CBP's conduct was committed to agency discretion by law or, alternatively, was not an abuse of discretion.  These contentions are without merit.

Starting with the issue of standing, it is undisputed that, whatever may be the status of the plaintiffs' fingerprints, the government to this day maintains in its computer systems considerable information obtained from the plaintiffs during their detention last year.  The continued retention of that information alone creates a case or controversy for which the

plaintiffs have standing to adjudicate the lawfulness of the government's actions and to obtain injunctive relief. As for permanent injunctive relief against future enforcement of the government's policy, the Court need not reach that at this time given the live controversy about the plaintiffs' information. Even if it did, however, the record is not sufficient to allow the Court to conclude that plaintiffs are at no risk of being subjected to the policy in the future.

As for the plaintiffs' substantive claims, the government fails to address the plaintiffs' primary claim: that the defendants' actions violated the First Amendment. Thus, the plaintiffs' First Amendment claim survives regardless of the disposition of plaintiffs' other claims.

Turning to the claims it does address, the government's contention that the plaintiffs' Fourth Amendment claim fails because their treatment was routine and thus *per se* reasonable misapprehends controlling case law and ignores the record. It is undisputed that these law-abiding American citizens were subjected to a terrorist investigation during which they were detained for many hours, interrogated about First Amendment activity, and forcibly fingerprinted and photographed. Even the government's own officials and policies recognize the extraordinary nature of this treatment, and none of the cases cited by defendants suggest that such treatment is a "routine" and thus reasonable way to treat American citizens suspected of no wrongdoing.

As for the RFRA claim, there can be no doubt that the statute applies here and, notwithstanding the government's suggestion to the contrary, it is not limited to actions that compel violations of mandated religious belief but plainly encompasses action that substantially and unjustifiably burdens religious activity, as did the government's treatment of plaintiffs.

Finally, the government's contention that its conduct is immune from judicial review under the APA because it is committed to agency discretion, or at least not an abuse of

discretion, fails to engage plaintiffs' claim that no statute cited by the government authorizes

detention and interrogation of citizens <u>unrelated</u> to a customs search for contraband or dutiable

good, such as a special terrorism-related enforcement operation.  It is well-settled that agency

action outside its statutory authority cannot be "committed to agency discretion," nor can it be an

abuse of discretionary power statutorily conferred.

ARGUMENT

The standards governing summary judgment are well established, as this Court has often

noted:

> In deciding a motion for summary judgment, the evidence and the inferences
> drawn from the evidence must be viewed in the light most favorable to the party
> opposing the motion.  Only when reasonable minds could not differ as to the
> import of evidence is summary judgment proper.  Ultimately, the function of the
> court is not to weigh the evidence and determine the truth of the matter but to
> determine whether there is a genuine issue for trial.

*40 Gardenville,* 387 F. Supp.2d at 210 (citations and quotations omitted).  Under these standards,

the government is not entitled to summary judgment for the reasons discussed below.

I.      THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS
        CONTENTION THAT PLAINTIFFS LACK STANDING.

The government contends the plaintiffs lack standing for three reasons.  First, they argue

that plaintiffs' claim for the expungement of unlawfully obtained records and information is no

longer live because fingerprint records have been purged.  *See* Def.'s Mem. 16 n.7.   Second, they

claim plaintiffs lack standing to enjoin future enforcement of the policy at issue in this case

because plaintiffs cannot show that they are likely to be harmed by the policy in the future.  *See*

*id.* at 16-18.  Third, defendants suggest that actual or possible changes in CBP policies eliminate

the plaintiffs' standing with respect to the policy.  *See id.* at 18.   Each argument lacks merit.

A.  Plaintiffs Have Standing For an Injunction Requiring the Expungement of
     Information Maintained by Defendants.

Plaintiffs seek declaratory relief and an injunction requiring the expungement from

defendants' files of not only their fingerprints and photographs, but also of all other information

obtained pursuant to their unlawful detention.  *See* First Am. Compl. at 22, request for relief ¶ 4

(seeking order that defendants "return all information, fingerprints and photographs unlawfully

obtained from the plaintiffs" and expunge "any information" from government databases).  The

maintenance of information about plaintiffs obtained through an unlawful detention constitutes a

continuing and ongoing harm, sufficient to establish standing to pursue the expungement of such

information.  *See, e.g., Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148,

1152 (D.C. Cir. 2004) (holding that, notwithstanding mooting of claim for prospective injunctive

relief against policy, plaintiff had standing to challenge her arrest because she sought the

expungement of arrest record); *Vives v. City of New York*, 305 F. Supp.2d 289, 304 (S.D.N.Y.

2003) (exercising jurisdiction to order that all computer information reflecting plaintiffs'

unlawful arrest and detention be expunged), *rev'd in part on other grounds,* 405 F.3d 115 (2d

Cir. 2005) (reversing only on qualified immunity ruling).

In a footnote the government contends that plaintiffs' expungement claim is moot

because "Plaintiffs' fingerprints were only temporarily stored in CBP's computers and have not

been preserved."  Def.'s Mem. at 16 n.7.  Whatever the status of the fingerprints,[1] that does not

---

[1] Plaintiffs maintain that the factual question of whether defendants continue to maintain
plaintiffs' fingerprint and photographic data remains in dispute.  *See* DHS/CBP 305 (attached to
PI Stoughton Decl. as Ex. 12) ("The DHS help desk advised that DHS HQ programming division
could LIKELY retrieve purged IDENT records") (caps in original); Fickett Depo. at 45:1-48:11
(stating deponent does not know whether plaintiffs' fingerprints and/or photographs were

(continued...)

resolve the expungement claim since the record is clear that the government retains extensive

additional information obtained from plaintiffs during their detention.   Specifically, defendants

continue to maintain TECS[2] records of each plaintiffs' detention, logging each plaintiff's name,

date of birth, and address; stating that each plaintiff attended a religious convention; and

describing in detail the search and investigation to which each plaintiff was subject.  *See* Bates

No. DHS/CBP 263-95 (attached to PI Stoughton Decl. as Ex. 6).  These records also describe

that plaintiffs were processed pursuant to a terrorist referral under the "Anti-Terrorism Passenger

Validation Program" or "APV."  *See* Bates No. DHS/CBP 299 (attached to PI Stoughton Decl. as

Ex. 10); Jacksta Depo. at 142:15-142:16, 145:9-146:9, 148:6-148:8 (attached to PI Stoughton

Decl. as Ex. 2).  All these records remain in defendants' centralized database and are routinely

accessed by border agents.  *See* Jacksta Depo. 264:9-264:14 (attached to PI Stoughton Decl. as

Ex. 2); *id.* at 101:6-102:11;105:15-107:17 (attached to Kim Decl. as Ex. 2).[3]

The continuing harm in this case is particularly compelling because the information on

plaintiffs stored in defendants' TECS system makes it more likely that plaintiffs will be singled

out for investigation in the future.  CBP's Personal Search Handbook instructs border agents to

consider the result of name queries in the TECS database in determining whether reasonable

---

[1](...continued)
forwarded to NTC or ICE) (attached to Kim Decl. as Ex. 1).

[2]Mr. Jacksta identified the acronym "TECS" as "Treasury Enforcement Communication
System."  *See* Jacksta Depo. at 149:4-149:6 (attached to PI Stoughton Decl. as Ex. 2).

[3]

suspicion exists to search an individual at the border.  *See* Bates No. DHS/CBP 0010-11

(attached to Kim Decl. as Ex. 3); Bates No. DHS/CBP 00015 (attached to Kim Decl. as Ex. 3)

(instructing agents to "Use the results of the TECS name check ... in the decision process to

determine if the search is warranted or if an increase in intrusiveness is warranted"); Jacksta

Depo. at 105:18-107:17 (attached to Kim Decl. as Ex. 2).  Border agents are more likely to

investigate someone whose TECS record indicated a prior terrorist referral, or APV, as plaintiffs'

TECS records do. *See* Bates No. DHS/CBP 299 (attached to PI Stoughton Decl. as Ex. 10);

Jacksta Depo. at 145:7-148:8 (attached to PI Stoughton Decl. as Ex. 2).  The Second Circuit

holds that the possible use of such information confers standing for purposes of injunctive relief.

*See DeShawn E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) ("Further, unlike *Lyons*, the plaintiffs

in this case allegedly continue to suffer harm from the challenged conduct because information

secured by the [government] is used to enhance their cases and to obtain plea bargains.").[4]

      **B.**      <u>Plaintiffs Have Standing to Seek Injunctive Relief Against the Policy and Practice
at Issue in This Case.</u>

Given that plaintiffs have standing to obtain injunctive relief as discussed above and

given that this will necessitate an adjudication of plaintiffs' substantive claims, the Court need

not address now the issue of a future request for permanent injunctive relief.  If it did, however,

defendants' arguments on this issue are without merit.

For purposes of standing, a plaintiff seeking to enjoin a government practice or policy



must establish only "a likelihood of future harm." *See Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004). *Accord DeShawn*, 156 F.3d at 344; *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983) (plaintiff may show first, that she will "have another encounter" with the police and second, that defendants "ordered or authorized" the challenged conduct). It is undisputed that the plaintiffs intend to attend future RIS Conferences (including this year's), and it is undisputed that the plaintiffs' treatment last year was authorized by a government policy that remains in effect. *See* Jacksta Deposition at 207:18-211:6, 245:9-21 (attached to PI Stoughton Decl. as Ex. 2).

Rather, the government bases its position on the suggestion that plaintiffs are unlikely to encounter the policy again when they attend future conferences. In this respect, it relies entirely on the assertion that last year's actions "are not necessarily indicative of how a referral for secondary examination may be handled in the future" and that the circumstances that led to last year's actions "may not exist in the future or, if they do, CBP may tailor its border inspections to avoid the kind of delays that occurred in 2004." Def.'s Mem. at 17-18 (citing Jacksta Decl. ¶ 8).[5]

Setting aside the fact that the harm at issue here entailed far more than "delays," such vague statements fail to meet defendants' burden on summary judgment to show that there are no circumstances under which plaintiffs could establish that they are likely to be harmed by the policy in the future. This is apparent from the Second Circuit's decision in *DeShawn E.*, 156

---

[5]Not only is this contention legally insufficient, it may be factually misleading. ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

F.3d at 344-45, which addressed and rejected the contention that plaintiffs were too unlikely to encounter a government policy to have standing to seek to enjoin it. There, the plaintiffs had to be arrested even to be subject to the challenged police-interrogation policy, a situation far more attenuated than the one presented on the record now before this Court. *DeShawn* forecloses the government's standing claim on the policy.

Perhaps recognizing the weakness of their position, the government contends that a minor and largely irrelevant change[6] it made in February 2005 and the possibility of future changes in policy bar the granting of injunctive relief. *See* Def.'s Mem. at 18. In doing so, the government cites no authority, which is not surprising since the Supreme Court has ruled that voluntary cessation of conduct by the government does not moot claims for injunctive relief. *See Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 189-94 (2000) (internal quotations omitted).

Finally, the government argues that an injunction against its policy would "be highly risky." Def.'s Mem. at 19. This is inexplicable, given that the government does not dispute that plaintiffs are law-abiding citizens about whom there is no suspicion of unlawful activity.

II.     THE GOVERNMENT HAS NOT SOUGHT SUMMARY JUDGMENT ON
        PLAINTIFFS' FIRST AMENDMENT CLAIM.

The primary claim advanced by plaintiffs is that the government violated their rights under the First Amendment. *See* Complaint ¶¶ 93-94 (April 20, 2005) (asserting First Amendment violations as first and second causes of action); First Am. Compl. ¶¶ 93-94 (July 20, 2005) (same). The government does not seek summary judgment on this claim, and thus it

---

[6]That the government made a change to its fingerprinting policy has no bearing on whether plaintiffs will be detained after returning from future conferences.

stands regardless of the resolution of plaintiffs' remaining claims.[7]

III.    THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON
        PLAINTIFFS' FOURTH AMENDMENT CLAIM.

Defendants argue that they are entitled to summary judgment on the grounds that processing United States citizens as terrorism suspects, subjecting them to a criminal investigation for over six hours, interrogating them about their personal associations and religious practices, and forcibly fingerprinting and photographing them amounts to no more than a routine border inspection that is *per se* reasonable under the Fourth Amendment. Although the government has broad power at the border, no case cited by defendants supports the proposition that it may subject citizens to this kind of treatment for any reason and without any level of suspicion. Given the facts in the record, with all reasonable inferences drawn in plaintiffs' favor, the searches and seizures of plaintiffs were not routine border inspections, and thus defendants' motion for summary judgment should be denied.

The government does not have unlimited authority to perform suspicionless searches and seizures at the border. Only so-called "routine" searches are *per se* reasonable; anything beyond a "routine" search or seizure requires individualized reasonable suspicion. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 540-41 (1985) (requiring reasonable suspicion to "justify a seizure of an incoming traveler for purposes other than a routine border search"); *United States v. Charleus*, 871 F.2d 265, 267 (2d Cir. 1989) (holding that routine searches of personal belongings and effects are permissible without suspicion, but "[m]ore intrusive border searches .

---

[7]In a short footnote the government acknowledges plaintiffs' First Amendment claim and states it "will respond to these claims upon further review of plaintiffs' specific theories." Def.'s Mem. at 21 n.9. Though plaintiffs are unsure what defendants mean to suggest by this footnote, it plainly does not constitute a motion for summary judgment on the First Amendment claim. If and when the government files a motion seeking disposition of this claim, plaintiffs will respond.

13

. . require at a minimum reasonable suspicion of criminal activity.").

A terrorism-related special inspection consisting of, at a minimum,[8] prolonged detention for up to six hours, interrogation regarding religious and associative activities, and forcible personal searches, fingerprinting and photographing, is not a "routine" border search. Under defendants' view, however, the government may subject any United States citizen to this kind of intrusion at the border for any reason and without any level suspicion whatsoever.

The Supreme Court and the Second Circuit have not expressly defined what separates "routine" border searches from searches requiring reasonable suspicion. "Routine" searches, however, have been confined to reasonable stops to determine citizenship and admissibility, pat-down searches, vehicle searches, and searches of baggage and personal effects such as wallets, pockets, and shoes. *See United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (vehicle searches); *United States v. Gaviria*, 805 F.2d 1108, 1113-14 (2d Cir. 1986) (packages); *Charleus*, 871 F.2d at 268-69 (simple pat-downs); *United States v. Grotke*, 702 F.2d 49, 51 (2d Cir. 1983) (shoes); *United States v. Turner*, 639 F. Supp. 982, 986 (E.D.N.Y. 1986) (baggage).

The Supreme Court and Second Circuit have never expanded the scope of suspicionless border searches beyond this realm, and no court has ever held that border agents may routinely subject U.S. citizens to processing as terrorist suspects without any articulable suspicion. Searches and seizures beyond the realm of "routine" have been found to require reasonable suspicion.[9] This precedent makes clear that "routine" searches and seizures are the kind of

---

[8]As argued in the accompanying Rule 56(f) motion, the record is incomplete as to the full scope of the special examinations to which plaintiffs were subjected, thus rendering defendants' motion for summary judgment based on the "routine" nature of those examinations premature.

[9]*See Montoya de Hernandez*, 473 U.S. at 541 (prolonged detention requires reasonable
(continued...)

14

minimally invasive encounters United States citizens would reasonably expect to experience

when crossing the border. *See, e.g., Asbury*, 586 F.2d at 975-76 (holding that strip searches are

non-routine because "although anyone entering or leaving the country may expect to have his

luggage and personal effects examined, he does not expect that his entry or departure, standing

alone, will cause him to be subjected to a strip search."). And courts in the Second Circuit have

held that the concept of "non-routine" is by no means limited to invasive body searches. For

example, *United States v. Soto-Teran*, 44 F. Supp.2d 185, 191 (E.D.N.Y. 1996), held that

although CBP has broad authority to inspect packages, including envelopes, as part of a routine

border search, reasonable suspicion is required to read and photocopy non-contraband

documents, because of the legitimate privacy interests of the passenger.[10]

    In light of this precedent, it is clear that defendants are not entitled to summary judgment

on the basis that what happened to plaintiffs was "routine." CBP processed plaintiffs as terrorist

---

[9](...continued)
suspicion of alimentary canal smuggling); *United States v. Esieke*, 940 F.2d 29, 34 (2d Cir. 1991)
(detention for several days requires same); *United States v. Ogberaha*, 771 F.2d 655, 657 (2d Cir.
1985) (body cavity search is not routine); *United States v. Moody*, 649 F.2d 124, 127 (2d Cir.
1981) (removal of clothing is not routine); *United States v. Sanders*, 663 F.2d 1, 1 (2d Cir. 1981)
(search of artificial limb not routine) *United States v. Asbury*, 586 F.2d 973, 975-76 (2d Cir.
1978) (strip searches not routine); *see also United States v. Vega-Barvo*, 729 F.2d 1341, 1347
(11th Cir. 1984) (x-ray searches require reasonable suspicion).

[10]Defendants suggest that *United States v. Flores-Montano*, 541 U.S. 149 (2004), holds
that only invasive body searches require reasonable suspicion, and all other searches or seizures
at the border are permissible for any reason. This is not accurate. *Flores-Montano* holds that
property searches are *per se* reasonable at the border, as long as they do not cause "serious
damage to, or destruction of, the property." 541 U.S. at 153. The Court specifically limited its
reasoning to searches that impact only a passenger's property, and do not impact any "dignity and
privacy interests." *Id.* Thus, *Flores-Montano* does not provide any guidance in determining
whether the searches and seizures at issue here, which went far beyond mere property searches
and plainly implicated plaintiffs' dignity and privacy, are reasonable under the Fourth
Amendment.

suspects pursuant to a special law enforcement operation targeting attendees of Islamic religious conferences.  *See* Bates No. DHS/CBP 299 (attached to PI Stoughton Decl. as Ex. 10) ("All subjects were processed as APVs."); Jacksta Deposition at 142:15-143:4; 148:6-8 (attached to PI Stoughton Decl. as Ex. 2) (APV program governs special inspections of any person with "some kind of connectivity to a terrorist activity" or who is "a possible terrorist.").  This was a criminal investigation, not merely a routine secondary inspection to determine compliance with basic immigration or customs laws.[11]  *See* Jacksta Decl. at ¶6 (plaintiffs were subjected to "an examination for evidence of terrorist-related activities" for the purpose of verifying that they were not "involved in illegal activity").  ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ Being treated as a suspected terrorist is precisely the kind of embarrassment and indignity that places plaintiffs' experience well outside the realm of "routine" and demands reasonable suspicion.  *See Moody*, 649 F.2d at 127 (describing non-routine searches as those involving "a relative degree of embarrassment or indignity . . . .").

That certain isolated components of plaintiffs' experience might be considered "routine" does not merit summary judgment on plaintiffs' Fourth Amendment claims.  For example, defendants point to precedent holding that limited pat-down searches, standing alone, are routine

---

[11]In their Motion for Summary Judgment, defendants describe the searches and seizures of plaintiffs as standard secondary inspections, and therefore "routine."  *See* Def.'s Mem. at 13 (quoting *United States v. Jerome-Oboh*, 883. F. Supp.917, 922 (W.D.N.Y. 1995)).  This characterization plainly relies on disputed facts and ignores the undisputed facts to the contrary listed in the text above.

at the border.  *See* Def.'s Mem. at 13-14 (citing *Charleus*, 871 F.2d at 268 (holding that a "limited patdown is a routine border search requiring no level of suspicion at all.")).  Plaintiffs do not rest their Fourth Amendment claim on the constitutionality of pat-down searches or general referrals to secondary inspection.  Rather, looking at the totality of the circumstances, these terrorism-related investigations were not merely routine border inspections, and therefore defendants are not entitled to summary judgment.

Several aspects of the special examinations highlight why they cannot be considered routine.  First, plaintiffs were detained for a prolonged period of time - up to six hours – ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████  The government must have reasonable suspicion before it can detain a U.S. citizen for an extended period of time when the purpose of that detention is a specific law enforcement investigation.  *See, e.g., Montoya de Hernandez*, 473 U.S. at 542 (border agents must have reasonable suspicion to justify detention of suspected drug smuggler).  This weighs against classifying these as *per se* reasonable border searches.  *See also United States v. Bravo*, 295 F.3d 1002, 1006 (9th Cir. 2002) ("[S]earches involving extended detention . . . are not routine.").

Second, plaintiffs were subjected to special interrogations that probed their activities at the RIS conference.  Government agents asked what plaintiffs did at the conference, the content of the lectures, and their reasons for attending.  *See* Rizek Decl. at ¶¶ 13, 16; Elshinawy Decl. at ¶ 13; Atassi Decl. at ¶ 13; Shibly Decl. at ¶ 22.  The Supreme Courtfor decades  has recognized that citizens have a strong privacy interest that protects them from compelled disclosure of activity protected by the First Amendment.  *See Watchtower Bible & Tract Soc. of N.Y. v. Village*

*of Stratton*, 536 U.S. 150, 166 (2002) (noting that citizens may choose anonymous association whether motivated by "fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible") (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995)); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (striking down compelled disclosure of membership in an association based on the "vital relationship between freedom to associate and privacy in one's associations."). No court has ever suggested that this kind of intrusion is an acceptable component of a routine, suspicionless border inspection.

Third, plaintiffs have presented evidence that CBP officers applied force in the course of processing plaintiffs. Officers grabbed plaintiffs' arms and fingers and forced them to provide fingerprints, and forcefully kicked open their legs for a pat-down search. *See* Elshinawy Decl. ¶ 17; Tabbaa Decl. ¶ 22; Rizek Decl. ¶ 18; Shibly Decl. ¶¶ 19-20. The use of force is not consistent with a "routine" border inspection. *See, e.g., Vega-Barvo*, 729 F.2d at 1346 (noting that level of physical contact, including the application of force, is relevant in finding that a search requires reasonable suspicion) ; *cf. Bradley v. United States*, 299 F.3d 197, 203-04 (3d Cir. 2002) (finding that although pat-downs are normally considered routine, "a pat-down gone awry could become so intrusive as to become a nonroutine search requiring application of the reasonable suspicion standard.").[12]

Fourth, the digital fingerprinting and photographing of plaintiffs was not a component of

---

[12]CBP officials in fact expressed disapproval of the use of pat-down searches in this case. *See* Protected Document 57 at 00073 ("In reviewing the IOILs I noticed that the only reason for personal searches was officer safety. I can't believe that we believed that many of these folks who were couples traveling with their children were armed or a threat. I think an examination of the routine patdown of these folks is needed.").

a routine border inspection.  A suspicionless detention for the purpose of taking digital

fingerprints and photographs violates the Fourth Amendment.  *See Hayes v. Florida*, 470 U.S.

811, 817 (1985) (detention for fingerprinting permitted only on probable cause and only "if the

procedure is carried out with dispatch."); *Davis v. Mississippi*, 394 U.S. 721 (1969) (same);

*Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992) (noting that although fingerprinting of

arrestees is acceptable, "we do not accept even this small level of intrusion for free persons

without Fourth Amendment constraint").[13] █████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████

---

[13]Defendants' reliance on *Utility Workers Union of America v. NRC*, 664 F. Supp. 136
(S.D.N.Y. 1987) is misplaced.  An employer taking an employee's ink fingerprints as a condition
of employment is far different from the government taking a law-abiding citizen's digital
fingerprints without consent as part of a specific investigation into terrorist activity when the
government does not have any reasonable suspicion of that citizen.



(continued...)

Finally, defendants' reliance on the important national security reasons for executing this special enforcement operation against plaintiffs is entirely irrelevant to their Motion for Summary Judgment. *See* Def.'s Mem. at 15 (arguing that "[t]he particular government interest at stake in this case buttresses the lawfulness of CBP's actions."). Defendants' motion is premised on the proposition that, as a matter of law, the government does not need to show any level of suspicion to justify these searches and seizures because they are "routine" and therefore *per se* reasonable under the Fourth Amendment. This proposition turns on the nature of those searches and seizures, not on their purported justification. Furthermore, as plaintiffs demonstrate fully in their Motion for Preliminary Injunction, the notion that the government may justify searches and seizures of law-abiding attendees of a religious conferences simply because the government suspects that people associated with terrorism may attend such events is anathema to the Constitution. *See* Plaintiffs' Prelim. Inj. Mem. at 20-24; Plaintiffs Supplemental Memorandum in Support of Preliminary Injunction ("Plaintiffs' Supp. Mem.") at 4-6.

IV. THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGEMENT ON PLAINTIFFS' CLAIM UNDER THE RELIGIOUS FREEDOM RESTORATION ACT.

Defendants argue that plaintiffs have not stated a claim under the Religious Freedom and Restoration Act ("RFRA") because the government policy is not covered by the statute and because plaintiffs have not alleged a "substantial burden" on their religious practice. Because defendants have presented these arguments as an attack on the pleadings, all factual allegations in the complaint are taken as true. *See, e.g., Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

---

[14](...continued)

████████████████████████████████████████
████████████████████████████████████████

Given this standard, plaintiffs have alleged a violation of RFRA. RFRA applies "in all cases" where government has substantially burdened religion, not just to generally applicable policies. 42 U.S.C. § 2000bb(b)(1).[15] Plaintiffs allege a policy of conducting special terrorism-related examinations of all attendees of certain religious conferences based on intelligence indicating that persons associated with terrorism may attend any of those conferences. Plaintiffs further allege that they were inspected solely because they attended one of these religious conferences. *See* Am. Compl. ¶¶ 1, 35-37.

This policy substantially burdens religion. Demonstrating substantial burden "is not a particularly onerous task." *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004). A "substantial burden" is one where "the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quoting *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981)). Defendants suggest that plaintiffs cannot make this showing because "the government has done nothing to prevent plaintiffs from attending religious conferences," *see* Def.'s Mem. at 21. The proposition that plaintiffs must show that the government's actions prevented them from exercising their religion is plainly inconsistent with the text of RFRA and the Second Circuit's interpretation thereof in *Jolly*, which finds that "substantial burden" means "pressure" to alter or curtail religious practice. Plainly, the intrusive examinations alleged here would pressure any reasonable person attending the RIS Conference. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (finding substantial burden where individual is forced to "choose between following the

---

[15]If the government's policy is not generally applicable and neutral toward religion, then it must be analyzed under the even stronger standard of *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993). In such a situation, any burden upon religious exercise, not just a substantial one, invokes strict scrutiny. *Id.* at 546.

precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . ., on the other hand.").

Moreover, plaintiffs need not allege that the burdened religious practice is mandatory. *Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003), expressly rejects a definition of "substantial burden" that "would require claimants to show that they either have been prevented from doing something their religion says they must, or compelled to do something their religion forbids." Instead, plaintiffs need only allege that attending the RIS Conference was "central or important" to their practice of Islam. *Id.* Plaintiffs have so alleged. *See* Am. Compl. ¶¶ 16-17, 19, 42, 58, 61, 68, 79. Thus, applying the appropriate legal standards, plaintiffs have clearly alleged a substantial burden on their religion.

Defendants also invoke a statutory affirmative defense that exempts government action where the burden on religion is *both* "in furtherance of a compelling governmental interest" *and* is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Defendants, however, make no argument that their actions were the least restrictive means of furthering that interest. Thus, defendants have not meet their burden. *See Francis v. Keane*, 888 F. Supp. 568, 573 n.6 (S.D.N.Y. 1995) (noting that this affirmative defense is the government's burden). Furthermore, defendants' purported interests cannot justify indiscriminately targeting tens of thousands of law-abiding attendees of Islamic religious conferences. *See United States v. Ramon*, 86 F. Supp.2d 665, 677 (W.D. Tex 2000) (holding that border agents may not target vehicles displaying religious symbols for inspection because of the substantial burden on religion). As argued in plaintiffs' motion for preliminary injunction, the attenuated connection between plaintiffs and defendants' purported intelligence concerns cannot

constitutionally justify defendants' actions.  *See* Plaintiffs' Prelim. Inj. Mem. at 20-24; Plaintiffs

Supp. Mem. at 4-6.  Thus, plaintiffs' RFRA claim stands.

V.     THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT ON
       PLAINTIFFS' CLAIM UNDER THE ADMINISTRATIVE PROCEDURE ACT.

       Defendants seek to dismiss plaintiffs' claim under the APA on the ground that

"determinations as to whether and what extent border searches should be conducted" are

"committed to agency discretion by law" and thus immune from judicial review.  *See* Def.'s

Mem. at 22-24.  Alternatively, the government argues that CBP did not "abuse its discretion"

under these customs laws. *Id.* at 25.

       The government misapprehends the nature of plaintiffs' *ultra vires* claim.  Defendants

justify their actions under various customs statutes and regulations.  *See* Def.'s Mem. at 23-

24.The evidence demonstrates, however that CBP's policy and practice of detaining,

interrogating, fingerprinting and photographing citizens whose citizenship and identity are not in

doubt is not justified by those customs statutes, which authorize detention <u>only</u> for the purpose of

conducting a customs inspection for contraband and dutiable goods.  It is undisputed that CBP's

actions were <u>not</u> in furtherance of a search for contraband or dutiable goods but pursuant to an

intelligence-driven directive.  *Id*. at 24.

       By definition, the claim that a federal official acted <u>without</u> statutory authority is not

barred by the APA exception for discretionary conduct <u>within</u> an official's authority.  As the

D.C. Circuit explains, "a decision cannot be shielded from liability if the decisionmaker is acting

without actual authority. . . .  An employee of the government *acting beyond his authority* is not

exercising the sort of discretion the discretionary function exception was enacted to protect."

*Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1196 (D.C. Cir. 1986)

(emphasis added);[16] *see also United States v. 16.03 Acres of Land*, 26 F.3d 349, 355 (2d Cir. 1994); *Hindes v. FDIC*, 1995 U.S. Dist. LEXIS 2328, at *3 (E.D. Pa. Feb. 28, 1995) (distinguishing activities "clearly outside of the [agency's] statutory powers" and those "improperly conducted but . . . committed to agency's discretion by law").

Plaintiffs acknowledge that CBP is authorized to carry out a wide range of activities at the border, including stopping individuals suspected of customs violations, searching vehicles, and searching baggage. *See* Def.'s Mem. at 23-24 (citing 19 U.S.C. § 482, 1455, 1461, 1467, 1581). Despite this broad authority, customs statutes do not authorize a suspicionless, scatter-shot search for criminal activity. *See Olson v. United States (The Atlantic)*, 68 F.2d 8, 9 (2d Cir. 1933); *United States v. Williams*, 617 F.2d 1063, 1080 n.19 (5th Cir. 1980) (asserting a distinction "between criminal activity and concealment of dutiable goods" at the border); *United States v. Adler,* 520 F. Supp. 313, 321 (E.D.N.C. 1980) (distinguishing border searches from general law enforcement searches). The statutes defendants cite do not establish roving authority to detain and investigate citizens <u>unrelated</u> to a customs search for contraband or dutiable goods.

As detailed above in the discussion of the Fourth Amendment claims, plaintiffs were subject to a special intelligence-driven operation, not a routine customs search for contraband or dutiable goods. Even if plaintiffs were detained subject to a valid customs investigation for some portion of time, the total duration exceeded that reasonably necessary for vehicle or baggage search. S*ee United States v. Espericueta Reyes*, 631 F.2d 616, 622 (9th Cir. 1980) ("some period

---

[16] Although the APA and Federal Tort Claims Act provisions barring judicial review of discretionary agency action are worded differently, courts look to cases under one provision in interpreting the other. See Def.'s Mem. at n. 10; *Drake v. Federal Aviation Administration*, 291 F.3d 59, 72-73 (D.C. Cir. 2002); *Scanwell Laboratories, Inc. v. Thomas*, 521 F.2d 941, 948 (D.C. Cir. 1975); *Frasier v. HHS*, 779 F. Supp. 213, 219 (N.D.N.Y. 1991).

of detention . . . is inevitable.  Nevertheless, so long as the searches are conducted with reasonable dispatch and the detention involved is reasonably related in duration to the search, the detention is permissible"); *United States v. Taylor*, 934 F.2d 218, 220 (9th Cir. 1991) ("brief further detention conducted by the government . . . must be predicated on an articulable suspicion or a minimal showing of suspicion of criminal activity."); *United States v. Johnson*, 991 F.2d 1287. 1292 (7th Cir. 1993) ("The detention of a border entrant must be reasonably related in scope to the circumstances justifying it") (internal citation omitted).[17]  In addition, defendants held plaintiffs until an ICE officer interrogated them about the RIS conference, *see* Caltigirone Depo. 150:13-151:1 (attached to PI Stoughton Decl. as Ex. 4)███████████████████
████████████████████████████████████████████ These examinations, and the detention of plaintiffs until the examinations were complete, were unrelated to a valid customs search under any authority cited by Defendants, in violation of the APA.[18]

## CONCLUSION

For all the foregoing reasons, the plaintiffs urge the court to deny the defendants' motion for summary judgment.

---

[17] CPB's own policies confirm this interpretation.  *See* INS Inspector's Field Manual §12.1 (2001) ("Temporary detention of a U.S. citizen for extensive questioning generally requires reasonable suspicion that the person is involved in illegal activity") (attached to Kim Decl. as Ex. 4). █████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[18] Even if CBP's actions fall within their statutory authority, they are still subject to judicial review.  Congress established objective limitations on agency action at the border.  *See Caban v. United States*, 671 F.2d, 1230, 1233 (2d Cir. 1982) (verification of citizenship is "objectively verifiable" fact not subject to exemption for "discretionary" action under FTCA).

Respectfully submitted,


NEW YORK CIVIL LIBERTIES UNION
   FOUNDATION, by

\_\_/s Christopher Dunn\_\_\_\_\_
CHRISTOPHER DUNN
COREY STOUGHTON
UDI OFER
ARTHUR EISENBERG
DONNA LIEBERMAN
125 Broad Street, 17th Floor
New York, N.Y.  10004
(212) 344-3005

CATHERINE KIM
American Civil Liberties Union
125 Broad Street, 17th Floor
New York, N.Y.  10004
(212) 549-2500

ARSALAN IFTIKHAR
KHURRUM WAHID
Council on American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C.  20003
(202) 488-8787

MICHAEL WISHNIE
245 Sullivan Street, 5th Floor
New York, N.Y.  10012
(212) 988-6430
NYCLU Cooperating Attorney

DAVID JAY
69 Delaware Avenue
Suite 1103
Buffalo, N.Y. 14202
(716) 856-6300

Dated: December 9, 2005
   New York, N.Y.

On the brief: Daniel Freeman, Law student intern

Murad Hussain, Law student intern
Rizwan Sabar, Law student intern
Allard K. Lowenstein International Human Rights Clinic,
    National Litigation Project, Yale Law School

# CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2005, I served by email and United States First Class Mail the attached PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT on the following counsel of record:

Anthony J. Coppolino
Special Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
Room 6102
20 Massachusetts Ave NW
Washington DC 20530

Mary K. Roach
Assistant United States Attorney
United States Attorney's Office
Western District of Buffalo
138 Delaware Avenue
Buffalo, New York 14202


__/s Christopher Dunn_____
CHRISTOPHER DUNN