UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SAWSAAN TABBAA, HASSAN SHIBLY,
ASMAA ELSHINAWY, KAREMA ATASSI and
GALEB RIZEK,

                                    Plaintiffs,

            v.                                                      **DECISION AND ORDER**
                                                                     05-CV-582S

MICHAEL CHERTOFF, *Secretary of the United
States Dep't of Homeland Security*, ROBERT C.
BONNER, *Comm'r of the United States Customs
and Border Protection*, MICHAEL D'AMBROSIO,
*United States Customs and Border Protection* and
JOSEPH J. WILSON, *Buffalo Port Director for the
United States Customs and Border Protection*,

                                    Defendants.

## I. INTRODUCTION

        Almost one year ago, the government detained the five Muslim-American plaintiffs

at the international border as they returned from attending an Islamic religious conference

in Toronto, Canada.  Plaintiffs were subjected to a special inspection operation, pursuant

to which they were detained for several hours, questioned, patted-down, fingerprinted and

photographed.  The government implemented these investigatory measures in response

to specific intelligence information it received that persons with known terrorist ties would

be attending religious conferences in Toronto, including the one that Plaintiffs attended.

        Plaintiffs challenge the government's actions as violative of the First and Fourth

Amendments, as well as taken in contravention of the Religious Freedom Restoration Act

("RFRA") and the Administrative Procedure Act ("APA").  Because Plaintiffs wish to attend

this year's conference without incident, they have moved for a preliminary injunction to bar the government from inspecting them upon their return in the same way it did last year. The government opposes Plaintiffs' request for injunctive relief and moves for summary judgment in its own favor.[1]

I have carefully considered the parties' arguments and the applicable law.  By all accounts, what happened to Plaintiffs at the border last year was unfortunate and understandably frustrating.  Plaintiffs were delayed for an extended period of time and subjected to unexplained inspection techniques that were inconvenient and made them feel uncomfortable.  The government readily admits that Plaintiffs' experience at the border was not ideal, and the record bears out that it has taken steps to remedy the more aggravating aspects of the stop for future inspections.

As unfortunate as this incident may have been, I find that it was not unconstitutional. It is well settled that the government's interest in securing the nation against the entry of unwanted persons and things reaches its pinnacle at the border.  It is for this reason that the government's authority to conduct routine searches and seizures at international crossings has long been recognized as plenary.  Having closely examined the facts and circumstances of this case, I find that the government conducted routine border searches, and that its actions were entirely consistent with the First and Fourth Amendments, as well as with the RFRA and the APA.  Accordingly, Plaintiffs' motions will be denied and Defendants' motion will be granted.

---

[1]As will be discussed further, Plaintiffs have filed a motion under Rule 56(f) of the Federal Rules of Civil Procedure in response to Defendants' Motion for Summary Judgment.

## II. BACKGROUND

**A.    Facts**

### 1.    Plaintiffs and the 2004 Reviving Islamic Spirit Conference

Each of the five Plaintiffs is Muslim and an American citizen.  (Plaintiffs' Statement of Disputed Material Facts ("Plaintiffs' Statement"), ¶ 1.)  They attended the 2004 Reviving Islamic Spirit ("RIS") conference at the Skydome in Toronto, Canada, in December 2004. (Plaintiffs' Statement, ¶ 1.)  The RIS conference is billed as an annual gathering organized by Canadian youth to educate Muslims about their religion with an emphasis on the Islamic traditions of education, tolerance and introspection.   (Ofer Decl., Exhibit 1.)   The conference drew approximately 13,000 attendees from across North America.  (Ofer Decl., Exhibit 2.)

Plaintiffs attended the 2004 RIS conference to learn more about their faith, participate in religious and cultural activities and to meet other Muslims.  (Atassi Decl., ¶¶ 3-7; Elshinawy Decl., ¶¶ 3-7, Rizek Decl., ¶¶ 3-5, Shibly Decl., ¶¶ 3-7; Tabbaa Decl., ¶¶ 3-6.)  Plaintiffs participated in various religious activities during the conference, including communal prayers three times a day.  (Atassi Decl., ¶ 6; Elshinawy Decl., ¶ 6, Rizek Decl., ¶ 4, Shibly Decl., ¶ 6; Tabbaa Decl., ¶ 6.)  Two of the plaintiffs view their participation in the annual RIS conference as their "Hajj" or pilgrimage.  (Atassi Decl., ¶ 6; Tabbaa Decl., ¶ 3.)

### 2.    U.S. Customs and Border Protection and RIS Conference Intelligence

United States Customs and Border Protection ("CBP") is the nation's unified border agency falling under the umbrella of the Department of Homeland Security ("DHS").

(Defendants' Statement of Undisputed Material Facts ("Defendants' Statement"), ¶ 3.)  As part of the government reorganization that created the DHS, CBP was formed by consolidating all governmental inspection and patrol personnel with responsibilities for securing the nation's borders at more than 300 ports of entry.  (Defendants' Statement, ¶ 4.)

Since the attacks of September 11, 2001, CBP's priority mission has been to prevent terrorists and terrorist weapons from entering this country.   (Defendants' Statement, ¶ 5.)  To carry out this mission, all persons seeking entry to the United States are subject to detention and search by CBP officers.  (Defendants' Statement, ¶ 6.)  CBP may, as a matter of standard operating procedure, refer individuals at any time for a detailed border examination, known as "secondary inspection."  (Defendants' Statement, ¶ 7.)  Such examinations involve more specific questioning of the traveler's activities outside of the United States, and a more detailed review of their documents, luggage and effects.   (Defendants' Statement, ¶ 8.)   These inspections are conducted to ensure compliance with customs and immigration requirements and to ensure that no harm is posed by the individual's entry into the United States.   (Defendants' Statement, ¶ 8.)  Secondary inspections may involve the collection of biometric information, including fingerprints and photographs of the individual as CBP deems necessary to verify their identity, to ensure that they may lawfully enter the United States, and to determine if they are otherwise involved in unlawful activities.  (Jacksta Decl., ¶ 4.)

When appropriate, CBP undertakes particular, focused enforcement operations to address specific threats or potential risks to the United States.  (Defendants' Statement, ¶ 10.)  In December of 2004, CBP had specific concerns about certain national and

international conferences, including the RIS conference that Plaintiffs attended. (Defendants' Statement, ¶ 11.)   Specifically, CBP had reason to believe that these conferences would serve as meeting points for terrorists to exchange ideas and documents, coordinate operations, and raise funds intended for terrorist activities. (Defendants' Statement, ¶ 12.)  In particular, CBP believed that certain individuals who were associated with terrorist organizations or activities and might pose a danger to the United States, or who were associated with organizations that provided financial support to terrorists, would be in attendance at the RIS conference.[2]  (Defendants' Statement, ¶ 13; Jacksta Decl., ¶ 5; Jacksta Dep., 151:22-152:10; 178:20-181:19; 222:3-5.)

In response to this intelligence information, CBP prepared an Intelligence Driven Special Operation ("IDSO").  (Defendants' Statement, ¶ 14.)  An IDSO is a directive to particular ports of entry to undertake special enforcement actions to meet specific concerns raised by intelligence information.  (Defendants' Statement, ¶ 15.)  Under the IDSO in this case, the Buffalo port of entry, among others, was instructed to identify and examine persons associated with the RIS conference or other similar conferences taking place in Toronto who sought entry to the United States.  (Defendants' Statement, ¶ 16; Plaintiffs' Statement, ¶ 16.)  The Buffalo port was directed to contact the National Targeting Center ("NTC") of CBP if persons identified in the IDSO were encountered in order to determine

---

[2]Plaintiffs have not been advised of or provided with the full extent of the government's intelligence because it contains classified and highly sensitive information.  The government has, however, offered to submit the entirety of its information to this Court for *ex parte*, *in camera* review.  In this Court's view, further disclosure in this regard is unnecessary, particularly because this Court earlier reviewed unredacted documents containing intelligence information in the context of Plaintiffs' Motion to Compel.  In addition, the Government has publicly provided all the information necessary to justify the issuance of the IDSO.  Beyond that, disclosure of the full nature of the government's intelligence is not necessary to resolve Plaintiffs' claims.

whether the individuals posed a particular threat.  (Defendants' Statement, ¶ 17.)

Pursuant to the IDSO, those individuals who were identified as having attended the conference were processed pursuant to the Anti-terrorism Passenger Validation ("APV") protocol and sent to secondary inspection for questioning about their activities during their trip.  (Defendants' Statement, ¶ 18; Plaintiffs' Statement, ¶ 22.)  They also underwent further examination of their documents and were examined for evidence of terrorist-related activities such as plans, money or weapons.  (Defendants' Statement, ¶ 18.)  This inspection included search of vehicles, and in some ports, including the port of Buffalo, fingerprinting and photographing.  (Defendants' Statement, ¶ 19.)  These measures were employed to confirm each individual's identity and verify that they were not on any watch list of suspected terrorists or attempting to use the conference as cover to cross the border. (Defendants' Statement, ¶ 20.)  CBP also sought to determine whether these individuals were carrying any illegal weapons, documents, monetary instruments, or any other prohibited items across the border, or were otherwise involved in illegal activity. (Defendants' Statement, ¶ 20.)

### 3.    The Border Stops at Issue

Plaintiffs left the RIS conference and returned to the United States at various times on December 26 and 27, 2004.[3]  Although Plaintiffs arrived at the Lewiston-Queenston international bridge at different times, they each experienced similar treatment when they

---

[3]Plaintiff Atassi left the RIS conference on December 26 and arrived at the border at 11:30 p.m.; Plaintiff Elshinawy left the RIS conference on December 27 and arrived at the border at 3:00 p.m.; Plaintiff Rizek left the RIS conference on December 26 and arrived at the border at midnight; Plaintiffs Shibly and Tabbaa left the RIS conference at midnight on December 26 and arrived at the border at 2:00 a.m. on December 27.  (Atassi Decl., ¶ 8; Elshinawy Decl., ¶ 8, Rizek Decl., ¶ 6, Shibly Decl., ¶ 8; Tabbaa Decl., ¶¶ 7, 8.)

presented themselves for admission to this country.

When Plaintiffs entered the primary inspection lane, the border officer in the booth requested their travel identification and inquired about their visit to Canada.  (Atassi Decl., ¶ 9; Elshinawy Decl., ¶ 9; Rizek Decl., ¶ 6; Shibly Decl., ¶ 9; Tabbaa Decl., ¶ 9.)  When the border officer determined that Plaintiffs had attended the RIS conference at the Skydome, he or she directed Plaintiffs to drive their vehicles to a nearby building for secondary inspection.  (Atassi Decl., ¶ 9; Elshinawy Decl., ¶ 9; Rizek Decl., ¶ 7; Shibly Decl., ¶ 9; Tabbaa Decl., ¶ 9.)

When Plaintiffs entered the building, they encountered other attendees from the RIS conference who had also been referred for secondary inspection.  (Atassi Decl., ¶ 10; Elshinawy Decl., ¶ 10; Rizek Decl., ¶ 8; Shibly Decl., ¶ 10; Tabbaa Decl., ¶¶ 12, 13.)  Plaintiffs were directed to fill out forms and were questioned about their trip to Canada and the RIS conference.  (Atassi Decl., ¶ 13; Elshinawy Decl., ¶ 13; Rizek Decl., ¶¶ 13, 16; Shibly Decl., ¶¶ 17, 22.)

Plaintiffs were thereafter summoned to another room where they were digitally fingerprinted and photographed.  (Atassi Decl., ¶ 14; Elshinawy Decl., ¶ 17; Rizek Decl., ¶ 19; Shibly Decl., ¶ 20.)  Border officers performed pat-downs on Plaintiffs prior to taking their fingerprints and photographs.  (Atassi Decl., ¶ 14; Elshinawy Decl., ¶¶ 16-17; Rizek Decl., ¶ 18; Shibly Decl., ¶ 19.)  Plaintiffs did not want to be fingerprinted and were not told why they were being fingerprinted and photographed.  (Atassi Decl., ¶¶ 14; Elshinawy Decl., ¶ 17; Rizek Decl., ¶¶ 11, 14, 21; Shibly Decl., ¶¶ 20, 21; Tabbaa Decl., ¶¶ 19, 20, 21.)

After Plaintiffs were questioned, fingerprinted and photographed, they were

7

released.  (Atassi Decl., ¶ 16; Elshinawy Decl., ¶ 18; Rizek Decl., ¶ 21 Shibly Decl., ¶ 25; Tabbaa Decl., ¶ 26.)  Plaintiff Atassi's inspection took five hours; Plaintiff Elshinawy's inspection took six hours; Plaintiff Rizek's inspection took between five and six hours; Plaintiffs Shibly and Tabbaa's inspections took four hours.  (Atassi Decl., ¶¶ 8, 16; Elshinawy Decl., ¶¶ 8, 18; Rizek Decl., ¶¶ 6, 21; Shibly Decl., ¶¶ 8, 25; Tabbaa Decl., ¶¶ 8, 26.) Border officers did not explain to Plaintiffs why they had been detained and inspected so thoroughly.  (Atassi Decl., ¶ 16; Rizek Decl., ¶ 21; Shibly Decl., ¶ 21; Tabbaa Decl., ¶ 26.)

There is no information whatsoever to suggest, and the government does not contend, that Plaintiffs are anything other than law-abiding American citizens.  Each Plaintiff wishes to attend the 2005 RIS conference, but fears being subjected to similar inspection procedures as last year.[4]  (Atassi Decl., ¶ 18; Elshinawy Decl., ¶ 20; Rizek Decl., ¶ 23; Shibly Decl., ¶ 27; Tabbaa Decl., ¶ 27.)   They are also concerned that the government will use the information it collected during the investigation to target them for future border stops.  (Atassi Decl., ¶ 19; Elshinawy Decl., ¶ 21; Rizek Decl., ¶ 24; Shibly Decl., ¶ 28; Tabbaa Decl., ¶ 29.)

**B.    Procedural History**

Plaintiffs filed their initial Complaint in this action in the United States District Court for the Eastern District of New York on April 20, 2005.  Plaintiffs filed an Amended Complaint in that district on July 20, 2005.

---

[4]Although Plaintiff Atassi would like to attend the 2005 RIS conference, she will be out of the country at that time.  (Atassi Decl., ¶ 18.)  She does, however, plan on attending future RIS conferences.  (Atassi Decl., ¶ 18.)

On August 12, 2005, this case was transferred here, to the United States District Court for the Western District of New York.  On October 12, 2005, the parties agreed to a discovery and briefing schedule on their anticipated motions, all with an eye toward completing briefing and argument in time for this Court to render a decision prior to the start of the 2005 RIS conference on December 23, 2005.

On November 28, 2005, Plaintiffs filed a Motion for Preliminary Injunction.[5]  On the same date, Defendants filed a Motion for Summary Judgment.[6]  On December 12, 2005, Plaintiffs filed a Motion to Dismiss Defendants' Motion for Summary Judgment pursuant to Rule 56(f).[7]  This Court heard oral argument on these three motions on December 15, 2005, and reserved decision at that time.

## III. DISCUSSION

### A.    Procedural Legal Standards and Analysis

#### 1.    Preliminary Injunction Standard

A preliminary injunction "is an extraordinary and drastic remedy which should not

---

[5]In support of their Motion for Preliminary Injunction, Plaintiffs filed the following documents: a memorandum of law, a supplemental memorandum of law, the Declaration of Karema Atassi, the Declaration of Asmaa Elshinawy, the Declaration of Galeb Rizek, the Declaration of Hassan Shibly, the Declaration of Sawsan Tabbaa, the Declaration of Udi Ofer, Esq., with attached exhibits, the Declaration of Corey Stoughton, Esq., with attached exhibits and a reply memorandum of law.

In opposition to Plaintiffs' motion, Defendants filed a memorandum of law, an Appendix of Deposition Excerpts, and the Second Declaration of Jayson P. Ahern.

[6]In support of their Motion for Summary Judgment, Defendants filed the following documents: a memorandum of law, a Statement of Undisputed Material Facts, with attached exhibits, the Declaration of David C. Fickett, the Declaration of Robert Jacksta, with exhibits, the Declaration of Dawn Caltagirone, with attached exhibits, and a reply memorandum of law.

In opposition to Defendants' motion, Plaintiffs filed a memorandum of law, a Statement of Disputed Material Facts, with attached exhibits, and the Declaration of Catherine Y. Kim, Esq., with attached exhibits.

[7]In support of its Motion to Dismiss Defendants' motion pursuant to Rule 56(f), Plaintiffs filed a memorandum of law and the Declaration of Corey Stoughton, Esq.  Defendants filed a memorandum of law in opposition to Plaintiffs' motion.

be routinely granted." <u>Med. Soc'y of New York v. Toia</u>, 560 F.2d 535, 538 (2d Cir. 1977);

<u>see</u> <u>also</u> <u>Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 934 F.2d 30, 33 (2d Cir. 1991).

The general standard for obtaining a preliminary injunction is well established in the

Second Circuit:

> "[a] party seeking a preliminary injunction must demonstrate
> '(1) irreparable harm should the injunction not be granted, and
> (2) either (a) a likelihood of success on the merits, or (b)
> sufficiently serious questions going to the merits and a balance
> of hardships tipping decidedly toward the party seeking
> injunctive relief.'"

<u>N.A.A.C.P., Inc. v. Town of East Haven</u>, 70 F.3d 219, 223 (2d Cir. 1995) (quoting

<u>Resolution Trust Corp. v. Elman</u>, 949 F.2d 624, 626 (2d Cir. 1991)).

A higher standard applies when "(i) an injunction will alter, rather than maintain, the

status quo, or (ii) an injunction will provide the movant with substantially all the relief sought

and that relief cannot be undone even if the defendant prevails at a trial on the merits."

<u>Tom Doherty Assocs. v. Saban Entm't, Inc.</u>, 60 F.3d 27, 33-34 (2d Cir. 1995).  The first

circumstance implicates a mandatory injunction, one that alters the status quo by

commanding a positive act. <u>Id.</u> at 34.  In such cases, a preliminary injunction may only be

granted if the movant demonstrates (1) that the injunction is necessary to prevent

irreparable harm, and (2) that there is a clear or substantial likelihood that it will prevail on

the merits or that extreme or serious damage will result from a denial of the injunction.  <u>See</u>

<u>Jolly v. Coughlin</u>, 76 F.3d 468, 473 (2d Cir. 1996); <u>see</u> <u>also</u> <u>Tom Doherty</u>, 60 F.3d at 34.

Under either standard, "the single most important prerequisite for the issuance of

a preliminary injunction is a demonstration that if it is not granted the applicant is likely to

suffer irreparable harm before a decision on the merits can be rendered."  <u>Bell & Howell:</u>

Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983) (citations omitted); see also Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981) (the threat of irreparable harm is the *sine qua non* for the granting of injunctive relief).

Alleged violations of the First and Fourth Amendment establish irreparable harm as a matter of law.  See Elrod v. Burns, 427 U.S. 347, 373-74, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); Latino Officers Ass'n v. City of New York, 196 F.3d 458, 462 (2d Cir. 1999) (stating that violations of First Amendment rights are commonly considered irreparable injuries for the purposes of preliminary injunctions); Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992) (violation of Fourth Amendment rights constitutes irreparable harm).

As for demonstrating success on the merits, this Court need not resolve which of the two standards discussed above applies in this case because as set forth below, summary judgment in Defendants' favor is warranted based on the undisputed material facts in the record.  Under either standard then, a preliminary injunction will not issue.

## 2.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

Under Rule 56(f), a court may delay ruling on a summary judgment motion or refuse the motion altogether if it finds that the party opposing summary judgment has established a need for additional discovery.  See FED. R. CIV. P. 56(f); Miller v. Wolpoff & Abramson, LLP, 321 F.3d 292, 303-04 (2d Cir. 2003).

> In opposing a summary judgment motion, a party may demonstrate, pursuant to Rule 56(f), that it is entitled to additional discovery by submitting "an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir.1999) (internal quotations and citation omitted).

Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F.Supp.2d 382, 395 (S.D.N.Y. 2005) (alteration in original).

This Court has reviewed Plaintiffs' Rule 56(f) motion and finds that it should be denied.  Plaintiffs contend that additional discovery is needed in three areas: (1) the extent to which the government retains information about them; (2) the nature and scope of the government's intelligence information; and (3) information regarding whether the treatment

12

Plaintiffs received at the border was standard practice.  In this Court's view, the discovery requested by Plaintiffs would not raise material issues of disputed fact, and thus would not alter the disposition of this case.  See id.

As to the first two requests, Plaintiffs argue that additional discovery is necessary in these areas in order for them to defeat Defendants' argument that they lack sufficient standing.  (Stoughton Decl., ¶¶ 17, 19.)  However, as will be discussed below, this Court finds that Plaintiffs have proper standing, so additional discovery in these areas is unnecessary.

As to the third request, Plaintiffs argue that they need additional information concerning whether it is CBP's standard practice to subject United States citizens to the kind of inspection that Plaintiffs went through in order to combat Defendants' argument that the searches were routine for purposes of the Fourth Amendment.  (Stoughton Decl., ¶ 21.)  Plaintiffs' argument misses the mark.  As will be discussed below, it is the nature of a search, particularly its degree of invasiveness, and not the frequency of its implementation, that determines whether a search is routine in the context of a Fourth Amendment challenge.  As such, additional information on whether it is CBP's standard practice to conduct these types of searches and information pertaining to the frequency of such searches is irrelevant.  Consequently, Plaintiffs' Rule 56(f) motion will be denied.  See Contemporary Mission, Inc. v. N.Y. Times Co., 842 F.2d 612, 622 (2d Cir.1988) (upholding the denial of a Rule 56(f) motion where the requested discovery was irrelevant to the issues to be adjudicated).

**B.      Substantive Legal Standards and Analysis**

**1.      Standing**

Defendants argue that Plaintiffs lack standing to obtain the prospective injunctive and declaratory relief they seek in their Amended Complaint.  First, Defendants argue that Plaintiffs lack standing to obtain injunctive relief barring the government from inspecting them in the same way as last year because their claim of future injury is purely speculative. Second, Defendants argue that Plaintiffs lack standing to obtain the expungement or return of all information collected during the border stop last year because they are unlikely to be harmed by the government's possession of such information.

It is axiomatic that in every federal case, the plaintiff must have standing to prosecute the action.  See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004).  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

At the outset, the plaintiff must establish the existence of an actual case or controversy.  See O'Shea v. Littleton, 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).  To do so, the plaintiff must show that he or she has suffered an injury in fact that a favorable judgment will redress.  See Newdow, 542 U.S. at 12 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)); see also Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S.Ct. 1717, 1723,109 L.Ed.2d 135 (1990) ("To establish an Article III case or controversy, a litigant first must clearly demonstrate that he has suffered an 'injury in fact.'").

"Specifically, a plaintiff must demonstrate that (1) he or she has suffered an injury; (2) the injury is traceable to the defendants' conduct; and (3) a federal court decision is likely to redress the injury." Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998) (citing Northeastern Fl. Contractors v. City of Jacksonville, 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)); see also Whitmore, 495 U.S. at 155 (the plaintiff must show that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision" (citations omitted).)

The existence of a past injury is generally insufficient to establish an injury in fact; the plaintiff must demonstrate a likelihood of future injury. See City of Los Angeles v. Lyons, 461 U.S. 95, 105-06, 103 S.Ct. 1600, 75 L.Ed.2d 675 (1983); see also Safir, 156 F.3d at 344. The future injury must be "distinct and palpable," Warth, 422 U.S. at 501, not merely "abstract," O'Shea, 414 U.S. at 494. "[T]he alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'" Whitmore, 495 U.S. at 155 (quoting Lyons, 461 U.S. at 101-102); see also Pennsylvania v. West Virginia, 262 U.S. 553, 593, 43 S.Ct. 658, 663-64, 67 L.Ed. 1117 (1923) (threatened injury must be "certainly impending" to constitute injury in fact).

As to Plaintiffs' standing to obtain injunctive relief, the government argues that the type of inspections that occurred after the 2004 RIS conference are not necessarily indicative of how Plaintiffs will be inspected in the future. (Jacksta Decl., ¶ 8.) That is, the circumstances surrounding the 2004 RIS conference, including the government's receipt of specific terrorism-related intelligence information, may not necessarily recur. (Jacksta Decl., ¶ 8.) As such, the government contends that Plaintiffs' claim of future injury is purely speculative, not "concrete" or "actual" as required. See Whitmore, 495 U.S. at 155.

In support of this argument, the government relies on changes and modifications that it has made to its fingerprinting policy.  Fingerprint checks are now performed only if there is at least one articulable fact concerning whether a traveler may lawfully enter the United States. (Jacksta Decl., ¶ 13.)  In such cases, the reason for the fingerprinting must be documented and the fingerprint check must be performed in the most expeditious manner possible. (Jacksta Decl., ¶ 13.)  Also, for United States citizens, any delay in processing attributable to fingerprinting that exceeds two hours must be approved by a supervisor. (Jacksta Decl., ¶ 13.)  The government avers that these changes will help avoid some of the delay and concerns regarding fingerprinting that arose with the 2004 border stops. (Jacksta Decl., ¶ 13.)

While this Court recognizes the government's efforts to make its fingerprinting policy less burdensome, it is not persuaded by the government's argument that Plaintiffs' lack standing.  In this Court's view, Plaintiffs have sufficiently established a likelihood of future injury.  It is undisputed that four of the Plaintiffs plan to attend the RIS conference in Toronto this year. (Elshinawy Decl., ¶ 20; Rizek Decl., ¶ 23; Shibly Decl., ¶ 27; Tabbaa Decl., ¶ 27.)  They will necessarily return to the border and be subject to CBP inspection.  At oral argument, the government would neither confirm nor deny whether it has similar intelligence information as it did last year, and would not state whether a similar IDSO will be in place for this year's conference.  Nonetheless, drawing all reasonable inferences in Plaintiffs' favor, this Court must conclude that since the government already suspects that the RIS and other religious conferences are gathering points for individuals with terrorist ties, it will again apply heightened inspection techniques to those individuals returning from the conferences.  This conclusion is supported by a fair reading of the Jacksta Deposition,

wherein Mr. Jacksta basically states that the CBP would take the same actions with respect to inspecting attendees returning from future conferences if it was in possession of similar intelligence.  (Jacksta Dep., 200:12 - 207:17.)

While the government's change in its fingerprinting policy may alleviate some of the concerns expressed by Plaintiffs, this Court finds that the changes are not so significant as to render Plaintiffs' claim of future injury speculative for standing purposes.  Drawing all reasonable inferences in their favor, Plaintiffs have established a sufficient likelihood that they will again be subjected to similar heightened scrutiny if they attend the 2005 RIS conference.  This showing is sufficient to establish standing for the injunctive relief sought. See Warth, 422 U.S. at 501 (future injury must be "distinct and palpable").

As for Plaintiffs' standing to obtain expungement or the return of information collected from them during the border stop, the government attests that Plaintiffs' fingerprints and photographs have been expunged from government databases.  (Fickett Decl., ¶ 6.)  However, the government concedes that it continues to maintain information about Plaintiffs and the 2004 border stop in its Treasury Enforcement Communication System ("TECS").  (See Defendants' Reply Memorandum in Support of their Motion for Summary Judgment, p. 2-3.)  The TECS information includes each plaintiff's name, date of birth, address, and the details of their 2004 detention, including the fact that they were processed pursuant to the APV protocol.  (Stoughton Decl., Exhibit 6; Stoughton Decl., Exhibit 10.)  This information is readily accessible to officers at the border for purposes of conducting secondary inspections.  (Jacksta Dep., 104:7 - 108:2.)   This Court finds that the government's continued possession of information that Plaintiffs allege was obtained from them through unlawful means constitutes a sufficient harm for purposes of

establishing standing to pursue expungement of the information.  See Hedgepeth v. Washington Metro. Area Transit Auth., 386 F.3d 1148, 1152 (D.C. Cir. 2004) (pursuit of expungement sufficient for standing).  Despite the government's arguments to the contrary, the possibility exists that Plaintiffs may be subject to heightened scrutiny based on the fact that they appear in the TECS system as prior APV referrals.  (See, e.g., Kim Decl., Exhibit 4 ("Listing of the subject in a lookout system may dictate further action, such as notifying . . . another agency of the person's entry.")  In this Court's view, the possibility that the TECS information could be used to expand, enhance, or lengthen a border investigation of any of the Plaintiffs is sufficient to confer standing.  See Safir, 156 F.3d at 344 (use of information in a detrimental manner is sufficient injury for standing purposes).

Accordingly, for the reasons stated above, this Court finds the government's argument that Plaintiffs lack standing to obtain the relief they seek to be unpersuasive.

**2.   Fourth Amendment**

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. CONST. amend. IV.  Plaintiffs allege that the government violated the Fourth Amendment when it subjected them to the IDSO inspections without first having reasonable suspicion.  (Amended Complaint, ¶ 95.)

It is a well-settled principle of Fourth Amendment jurisprudence that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border."  United States v. Ramsey, 431 U.S. 606, 616, 619, 97 S.Ct. 1972, 1978, 1980, 52 L.Ed.2d 617 (1977) (characterizing this

area of law as being "as old as the Fourth Amendment itself"); United States v. Jerome-Oboh, 883 F.Supp. 917, 921 (W.D.N.Y. 1995). "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." United States v. Montoya De Hernandez, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985).

As the Supreme Court has stated, "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," and therefore the Court has time and again upheld government action taken in the "paramount interest . . . [of] protecting its territorial integrity." United States v. Flores-Montano, 541 U.S. 149, 152, 153, 124 S.Ct. 1582, 1585, 1586, 158 L.Ed.2d 311 (2004); United States v. Ullah, 04-CR-30, 2005 WL 629487, at *30 (W.D.N.Y. Mar. 17, 2005). It is for this reason that the Supreme Court recognizes that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." Montoya De Hernandez, 473 U.S. at 536, 544 (Fourth Amendment interests "lean[ ] heavily to the Government" at the border); Jerome-Oboh, 883 F.Supp. at 922. Thus, "*routine* searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." Montoya De Hernandez, 473 U.S. at 538 (emphasis added); United States v. Salgado, 917 F.Supp. 996, 1006 (W.D.N.Y. 1996) (routine border searches are reasonable *per se*).

Whether a border search is routine is therefore the linchpin upon which its constitutionality hinges. If the search is routine, it is *per se* reasonable under the Fourth

Amendment and nothing further is required.  See id.; see also United States v. Singh, 415 F.3d 288, 293 (2d Cir. 2005) (noting that "routine searches at the border . . . have long been viewed as reasonable *per se* and need not be supported by probable cause or a warrant").  If the search is non-routine, at least reasonable suspicion must exist or the search is unconstitutional.  See Montoya De Hernandez, 473 U.S. at 541 ("detention of a traveler at the border, beyond the scope of a routine customs search and inspection" must be supported by reasonable suspicion).

What distinguishes a routine search from a non-routine search has thus far not been succinctly identified, however the degree of invasiveness has developed as the critical point of inquiry.  Cf. United States v. Sanders, 663 F.2d 1, 3 (1981) ("In determining whether the search . . . was reasonable, we must first determine the degree of intrusion involved.")  In Flores-Montano, the Court noted that non-routine searches may include "highly intrusive searches of the person" that may impact or affect the "dignity and privacy interests of the person being searched."  541 U.S. at 152. In Montoya De Hernandez, the Court suggested in a footnote that non-routine border searches include "strip, body cavity, or involuntary x-ray searches."  473 U.S. at 541, n. 4.   Other caselaw in this area confirms that non-routine searches involve a high degree of intrusiveness.  See, e.g., Montoya De Hernandez, 473 U.S. at 542 (alimentary canal smuggling); United States v. Esieke, 940 F.2d 29, 33-35 (2d Cir. 1991) (reasonable suspicion required for alimentary canal search); United States v. Ogberaha, 771 F.2d 655, 658-660 (2d Cir. 1985) (body cavity search requires reasonable suspicion); United States v. Grotke, 702 F.2d 49, 51 (2d Cir. 1983) ("greater intrusions into a person's privacy, such as strip searches, require 'reasonable suspicion' on the part of the border official"); Sanders, 663 F.2d at 1 (search of artificial

limb not routine).

Searches that do not rise to this level of personal intrusiveness are routine and do not require reasonable suspicion.  Such searches typically include stops to determine citizenship and admissibility, vehicle searches, baggage searches, and searches of personal effects such as wallets, pockets and shoes.  See Flores-Montano, 541 U.S. at 153 (vehicle searches); United States v. Gaviria, 805 F.2d 1108, 1113-14 (2d Cir. 1986) (packages); Grotke, 702 F.2d at 51 (shoes); United States v. Turner, 639 F.Supp. 982, 986 (E.D.N.Y. 1986) (baggage).

In this case, it is undisputed that the government did not have individualized reasonable suspicion to stop and search Plaintiffs.  Accordingly, the government's actions are consistent with the Fourth Amendment only if the searches were routine.

The facts are generally not in dispute.  Plaintiffs were questioned, patted-down, fingerprinted and photographed during an inspection process that lasted, at the longest, six hours.  Plaintiffs were not subjected to strip, body cavity or involuntary x-ray searches. See Montoya De Hernandez, 473 U.S. at 541, n. 4.  Plaintiffs nevertheless argue that based on the totality of the circumstances, the searches at issue cannot be classified as routine border searches.

First, Plaintiffs argue that the length of their detention – six hours at the longest – makes the search non-routine.  However, the delay that occurred in this case, while certainly regrettable, does not render the search non-routine.  It appears that the delay was attributable to a confluence of unanticipated circumstances – the time of day, reduced CBP staffing, an unexpected influx of conference attendees, and, to some degree, Plaintiffs' refusal to cooperate with the searches.  The Fourth Amendment, however, does not "shield

21

entrants from inconvenience or delay at the international border." <u>Flores-Montano</u>, 541 U.S. at 155 n.3. The Supreme Court has consistently rejected the application of "hard-and-fast time limits" for border searches, preferring instead to apply "common sense and ordinary human experience." <u>Montoya De Hernandez</u>, 473 U.S. at 543 (citing <u>United States v. Sharpe</u>, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985)). In this Court's view, a six hour delay at the international border for inspection purposes under the circumstances of this case, while certainly not desirable, does not approach the bounds of unreasonableness under the Fourth Amendment.

Second, Plaintiffs argue that the searches were non-routine because they included questioning about their activities at the RIS conference. Specifically, Plaintiffs object to having to respond to questions concerning why they attended the conference and what they did there. Plaintiffs argue that this line of inquiry constitutes compelled disclosure in violation of the First Amendment. However, it seems clear to this Court that in the context of a person seeking entry to the United States, particularly in light of the government's intelligence information in this case, these types of questions are perfectly reasonable investigatory inquiries tailored to determine whether Plaintiffs posed any risk to the United States. To fulfill its security obligations at the border, the government must be able to inquire of individuals to ascertain their true identity, determine if they pose a threat, and examine whether they are lawfully permitted to enter the country. In this context, this line of inquiry does not implicate First Amendment compelled disclosure concerns.

Third, Plaintiffs argue that the searches at issue were not routine because CBP officers applied force during the course of processing them through the pat-downs and fingerprinting. This argument is also without merit. Pat-down searches are minimally

22

intrusive, and for that reason, have been repeatedly found to be routine.  See, e.g., United States v. Charleus, 871 F.2d 265, 268 (2d Cir. 1989) (collecting cases).  The pat-downs in this case were conducted to ensure officer safety prior to fingerprinting.  (Caltagirone Decl., ¶ 6.)  CBP officers must disarm and secure their weapons before fingerprinting an individual, in part because the fingerprinting process puts the officer in close physical contact with the individual being fingerprinted.  (Caltagirone Decl., ¶ 6.)  Pat-downs ensure that there are no weapons or sharp objects on the individual that could harm the officer during the fingerprinting process.  (Caltagirone Decl., ¶ 6.)

There is an issue of fact in the record pertaining to the level of force used by CBP officers to complete the pat-downs.  Plaintiffs Rizek and Shibly assert that CBP officers forcefully kicked their feet open and almost knocked them to the ground to effectuate the pat-downs.  (Rizek Decl., ¶ 18; Shibly Decl., ¶ 19.)  The government denies that such force was used.  In any event, this factual dispute does not preclude summary judgment because even assuming that some force was used as Plaintiffs' attest, this Court finds that kicking Plaintiffs' feet apart to properly position them for a pat-down search does not rise to the level of physical invasiveness to render the entire search non-routine.  See United States v. Oyekan, 786 F.2d 832, 835 (8th Cir. 1986) (initial patdown followed by search held to be routine border search).

As for the fingerprinting and photographing of Plaintiffs, this too is a minimally invasive routine search.  Cf. Davis v. Mississippi, 394 U.S. 721, 727, 89 S.Ct. 1394, 1398, 22 L.Ed.2d 676 (1969) (commenting in a non-border case that "fingerprinting involve none of the probing into an individuals' private life or thoughts that marks an interrogation or search").  Photographs of individuals being fingerprinted are taken in conjunction with the

23

fingerprints to best verify an individual's identity.  (Fickett Decl., ¶ 2.)  There is no independent use of the photograph, it is simply part of the fingerprinting protocol.  (Fickett Decl., ¶ 2.)  Fingerprints are taken because a fingerprint match is more precise than name identification and provides greater assurance that the individual does not pose a threat to the United States.  (Jacksta Decl., ¶ 12.)  Fingerprinting enables CBP officers to better determine whether there is a warrant against an individual and whether the individual is in fact a citizen and using valid identification.  (Jacksta Decl., ¶ 12.)  In this regard, fingerprinting is a tool used by the government to discharge its duty of verifying the identity and admissibility of those who present themselves for admission to the United States.

Again, there is an issue of fact concerning the level of force that was used to take Plaintiffs' fingerprints.  In particular, Plaintiffs Elshinawy, Shibly and Tabbaa, suggest that physical force was used to take their fingerprints and Plaintiff Tabbaa apparently cried during the process.[8]  (Elshinawy Decl., ¶ 17, Shibly Decl., ¶ 20; Tabbaa Decl., ¶¶ 20, 22.) The government notes that some level of physical touching is involved in the taking of fingerprints because the print has to be clear in order to be read by the machine.  It denies, however, that any more physical contact than was necessary was used in this case.  This Court finds that summary judgment is not precluded by this factual dispute because even assuming that CBP officers treated Plaintiffs as they allege, that level of physical touching is not the type of invasiveness that characterizes a non-routine search.

Fourth, Plaintiffs argue that the searches were non-routine because the government

---

[8]Plaintiff Tabbaa's crying was not due to the application of physical force.  (See Tabbaa Decl., ¶ 22 ("As I walked away from my children, my youngest daughter . . . began crying.  She didn't want me to leave and wouldn't let go of me.  I also began to cry.").)

ordinarily does not fingerprint and photograph United States citizens.  The concept of "non-routine" in the context of the reasonableness of a border search, however, does not mean "unusual" or "uncommon" in this context.  As set forth above, whether a search is non-routine is determined by the degree of invasiveness.  As such, whether the government ordinarily fingerprints and photographs American citizens does not inform the analysis.  Even if the government seldom employs such measures, it does not mean that the use of fingerprinting and photographing is non-routine.

Finally, Plaintiffs argue that the searches were non-routine because they were processed as suspected terrorists under the APV protocol, which caused them embarrassment and indignity.  Again, this argument fails because it is the invasiveness of the government's actions that must be examined, not the rubric under which those actions are taken.

In conclusion, this Court finds that Plaintiffs were subjected to routine border searches for which reasonable suspicion was not required.  The searches in this case do not rise to the level of highly intrusive searches that have been found to require reasonable suspicion.  The searches at issue are simply not comparable to strip, body cavity or involuntary x-ray searches, nor did they impermissibly invade Plaintiffs' personal dignity or privacy interests.  Although perhaps not conducted in an ideal manner,[9] the searches were routine and required no reasonable suspicion.

---

[9]This Court is not engaging in "unrealistic second-guessing" or "post hoc" evaluation of the CBP's methods or means of reaching its objectives.  See Sharpe, 470 U.S. at 686-87.  The government freely concedes that the inspection of Plaintiffs could have better been conducted.

### 3.      First Amendment: Freedom of Speech and Assembly

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble."  U.S. CONST. amend. I.  Plaintiffs allege that the government's policy, pursuant to the IDSO, of stopping, detaining, interrogating, fingerprinting and photographing them upon their return from the RIS conference violates the First Amendment.  (Amended Complaint, ¶ 94.)  They assert that their participation in the RIS conference is constitutionally protected expressive activity.  Cf. NAACP. v. Claiborne Hardware Co., 458 U.S. 886, 912, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) ("The established elements of speech, assembly, [and] association . . . 'though not identical, are inseparable.'" (citation omitted).)

The United States Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  Roberts v. United States Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) (citing cases).  Plaintiffs assert that the *effect* of the government's enforcement policy, whatever the motivation, has been to burden their First Amendment rights and chill their desire to return to the RIS conference.  Clearly, Plaintiffs' attendance at and participation in the RIS conference are constitutionally protected activities that cannot be unduly burdened by the government.  See id.

The existence of protected activity, however, does not end the inquiry. "Infringements on [the right to associate] may be justified by regulations adopted to serve

compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."[10]   Roberts,   468 U.S. at 623.  It is uncontested that in this case, the government's interest in protecting the nation from terrorism constitutes a compelling state interest unrelated to the suppression of ideas.  See Flores-Montano, 541 U.S. at 153 ("It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."); Humanitarian Law Project v. Reno, 205 F.3d 1130, 1135 (9th Cir. 2000) ("the government has a legitimate interest in preventing the spread of international terrorism, and there is no doubt that that interest is substantial").  It is further uncontested that the IDSO was instituted to serve this compelling interest.  Accordingly, the only issue is whether the government's actions were narrowly tailored to serve that interest.

At the outset, it is important to note that there is no evidence that the IDSO and the inspection of Plaintiffs were intentionally implemented to suppress Plaintiffs' speech, prevent them from associating with whomever they choose, or punish them for attending the RIS conference.  Rather, the IDSO was implemented to verify the identity of each individual returning from the identified conferences to ensure that they were not on any terrorist watch list or attempting to bring prohibited items across the border.  (Defendants'

---

[10]Plaintiffs contend that the Roberts standard governs their claim.  (Plaintiffs' Reply Memorandum of Law filed in Support of their Motion for Preliminary Injunction, p. 1.)  Defendants contend that the standard set forth in United States v. O'Brien applies.  391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d. 672 (1968).  The O'Brien standard differs only slightly from the Roberts standard.  The O'Brien standard provides that "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  Id. at 377.  O'Brien arguably sets forth a more lenient standard than Roberts.  Because this Court finds that the government's action meets the Roberts standard, it necessarily meets the O'Brien standard as well.

Statement, ¶ 20.)

Plaintiffs argue that they were caught up in an unconstitutional "guilt-by-association" dragnet.  (Plaintiffs' Memorandum in Support of their Motion for Preliminary Injunction, p. 18.)  In support of this argument, Plaintiffs rely principally on cases involving restrictive government actions taken solely to punish individuals for their association with a certain group – the Communist Party.  See DeJonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 260-61, 81 L.Ed. 278 (1937) (finding statute criminalizing participation in a meeting of the Communist Party unconstitutional); Aptheker v. Sec'y of State, 378 U.S. 500, 515, 84 S.Ct. 1659, 1668, 12 L.Ed.2d 992 (1964) (finding denial of passports to members of the Communist Party to unduly infringe right to association); United States v. Robel, 389 U.S. 258, 261, 88 S.Ct. 419, 422, 19 L.Ed.2d 508 (1967) (striking down statute deeming it unlawful for members of the Communist Party to work in a defense facility).  These cases are distinguishable, however, because the government's actions here were significantly less restrictive and its intention was benign.  That is, the government's action was taken to prevent terrorists from entering this country, not to punish Plaintiffs for being Muslim or associating themselves with other Muslims at the RIS conference.

But the major distinction is that these cases are not border cases.  While Plaintiffs argue that the border situs is irrelevant, it is an inescapable truth that the government enjoys plenary authority at the international border.  Montoya De Hernandez, 473 U.S. at 537.  Plaintiffs have come forth with no authority for the proposition that the government's authority disappears or diminishes in the context of a First Amendment claim challenging

a routine investigatory action taken at the border.[11]   See Church of Scientology of Ca. v. Simon, 460 F.Supp. 56, 59 (C.D. Cal. 1978) (applying Fourth Amendment principles to First Amendment challenge to border search and finding that "the search involved here must be measured against the normal border search standards"), aff'd, 441 U.S. 938, 99 S.Ct. 2153, 60 L.Ed.2d 1040 (1979).   The government must still be afforded appropriate discretion to act in furtherance of its compelling interest.   Therefore, the question of whether the government narrowly tailored its inspections program to be minimally restrictive of Plaintiff's First Amendment rights is necessarily informed by the government's traditionally broad authority to act at the border.[12]

Interception and detection at international border crossings is likely the most effective way to protect the United States from terrorists and instruments of terrorism. Here, in response to specific intelligence information that individuals with known terrorist ties would be present at the RIS and other religious conferences, the government implemented an IDSO that was narrowly tailored to ensure that terrorists or those associated with terrorists would not enter the United States.   The government did not target everyone attempting to enter from Canada.   It did not target all Muslims.   It targeted only those individuals – whether Muslim or not –  who the primary inspectors could confirm attended

---

[11]Plaintiffs argue that the Supreme Court's opinion in Lamont v. Postmaster Gen. supports their argument that the border situs in this case is irrelevant for First Amendment purposes.   381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).   In Lamont, the Court invalidated on First Amendment grounds a federal statute prohibiting delivery of foreign "communist political propaganda" mail unless the American recipient requested delivery in writing.   See id. at 305.   Lamont, however, is not factually on point, nor does it directly address the application of the First Amendment to otherwise constitutional routine searches conducted on individuals presenting themselves for admission to the United States at the international border.

[12]This is not to say that the First Amendment could never be violated at the border.   Certainly it is possible that a government action could be permissible under the Fourth Amendment, but unconstitutional under the First.   This, however, is not such a case.

the religious conferences at issue.  Moreover, the IDSO limited the inspection techniques to routine searches, as opposed to implementing more invasive measures.  This Court finds that the government employed the least restrictive means to respond to the threat it faced.[13]  Consequently, this First Amendment claim fails.

### 4.    First Amendment: Freedom of Religion and the RFRA

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. CONST. amend. I.  Similarly, "RFRA, [42 U.S.C. § 2000bb et seq.] prohibits the federal government from 'substantially burdening' a person's exercise of religion even if the burden results from a rule of general applicability, unless the government can demonstrate that the burden is: (1) in the furtherance of a compelling governmental interest; and (2) the least restrictive means of furthering that compelling governmental interest."  Faith Temple Church v. Town of Brighton, New York, 04-CV-6355, 2005 WL 3454309, *2 (Dec. 19, 2005 W.D.N.Y.); see also Jolly, 76 F.3d at 474-75.

Plaintiffs argue that the government's inspection policy violates their right to freely exercise and practice their religion as protected by the First Amendment and RFRA. (Amended Complaint, ¶¶ 93, 96.)  The applicable analysis on these two claims is the same: the government must demonstrate that its action is taken in furtherance of a

---

[13]Plaintiffs' argument that the government's IDSO was not narrowly tailored because it failed to focus on only those individuals actually suspected of being terrorists ignores the fact that the government has an equally compelling interest in identifying and investigating individuals who may have been in contact with or associated themselves, whether knowingly or unknowingly, with such individuals.

compelling interest and is the least restrictive means necessary to do so.[14]  See Jolly, 76

F.3d at 473-74; Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 546,

113 S.Ct. 2217, 2233-34, 124 L.Ed.2d 472 (1993).  For the reasons already set forth in the

context of Plaintiffs' other First Amendment claim, this Court finds that the IDSO

inspections were the least restrictive means of furthering the government's interest in

protecting its borders.  Accordingly, these claims fail.

In so finding, this Court notes that the government did not target individuals

returning from the RIS conference because they had attended a religious conference or

because they appeared to be of the Muslim faith.  (Jacksta Decl., ¶ 9.)  It is not the

government's policy to discriminate in its border security operations on the basis of religion

or attendance at religious conferences.  (Jacksta Decl., ¶ 9.)  Plaintiffs were selected for

increased inspection because they attended a particular conference that the government

suspected would be attended by individuals with ties to terrorism.  (Jacksta Decl., ¶¶ 5, 8.)

The government's fear was that these individuals would use a legitimate event such as the

RIS conference as a cover to meet and exchange information, documents, money, and

ideas about acts of terrorism.   (Jacksta Decl., ¶ 5.)   Anyone who attended these

conferences, no matter what their religion or ethnicity, would have been subjected to the

IDSO procedures.

**5.** **APA**

The APA authorizes courts "to hold unlawful and set aside agency action . . . in

---

[14]For purposes of this analysis, this Court assumes that Plaintiffs' religious beliefs are sincerely held and that the government's actions constitute a burden sufficient to trigger the First Amendment and RFRA.  See Jolly, 76 F.3d at 474-79.

excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(c).  "It is 'central to the real meaning of "the rule of law," [and] not particularly controversial' that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so." Haitian Centers Council, Inc. v. Sale, 823 F.Supp. 1028, 1046 (E.D.N.Y. 1993) (quoting Transohio Sav. Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 621 (D.C.Cir.1992) (citations omitted) and citing Chrysler Corp. v. Brown, 441 U.S. 281, 302, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979)). "Agency actions that do not fall within the scope of a statutory delegation of authority are *ultra vires* and must be invalidated by reviewing courts." Id. (citations omitted).

Plaintiffs argue that the government exceeded its statutory authority in violation of the APA.  They argue that the CBP's actions were *ultra vires* because no specific statute grants it the authority to detain, question, fingerprint and photograph United States citizens due to concerns about terrorism.  As discussed above, however, this treatment constitutes a routine search under the Fourth Amendment, and it appears entirely consistent with the CBP's statutory mandate to "prevent[ ] the entry of terrorists and the instruments of terrorism into the United States."  6 U.S.C. § 111(b)(1)(A).  Plaintiffs have not established that the CBP's otherwise constitutional actions exceeded its broad statutory authority.

## IV. CONCLUSION

For the reasons discussed above, this Court finds that the government did not violate Plaintiffs' rights protected by the First and Fourth Amendments or the RFRA and the APA.  Plaintiffs are therefore unable to succeed on their claims and a preliminary injunction will not issue.  Rather, this Court finds that based on the undisputed facts in the

record, the government is entitled to summary judgment in its favor.  Accordingly, Plaintiffs'

motions will be denied and Defendants' motion will be granted.

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' Motion for Preliminary Injunction (Docket

No. 50) is DENIED.

FURTHER, that Defendants' Motion for Summary Judgment (Docket No. 51) is

GRANTED.

FURTHER, that Plaintiffs' Motion to Dismiss Defendants' Motion for Summary

Judgment (Docket No. 63) is DENIED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:        December 21, 2005
              Buffalo, New York


                                          /s/William M. Skretny
                                          WILLIAM M. SKRETNY
                                          United States District Judge